**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| M1 HOLDINGS INC., | |
| Plaintiff, | |
| v. | Case No. 22-cv-01162 |
| MEMBERS 1ST FEDERAL CREDIT UNION, | Judge Robert W. Gettleman |
| Defendant. | Mag. Judge Jeffrey Cole |
| MEMBERS 1ST FEDERAL CREDIT UNION, | |
| Counter-Claimant, | |
| v. | **JURY TRIAL DEMANDED** |
| M1 HOLDINGS INC. and LINCOLN SAVINGS BANK, | |
| Counter-Defendants. | |

**DEFENDANT AND COUNTER-CLAIMANT'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Dated: March 23, 2022

Adam Wolek
Patricia M. Flanagan
(*pro hac vice forthcoming*)
Fox Rothschild LLP
777 South Flagler Drive
Suite 1700, West Tower
Telephone: (312) 517-9299
Facsimile: (312) 517-9201
awolek@foxrothschild.com
pflanagan@foxrothschild.com

*Attorneys for Defendant/Counter-Claimant*

131757214

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................................... 2

    A. Members 1st and its M1st Mark ................................................................... 2

    B. Counter-Defendants and Their Unlawful and Willful Activities ................... 3

III. A PRELIMINARY INJUNCTION IS WARRANTED ............................................. 6

    A. The Counterclaims Have a High Likelihood of Success on the Merits ......... 6

        1. Members 1st's M1st Mark is Protectable and Incontestable .............. 7

        2. A Likelihood of Confusion Exists ..................................................... 8

    B. Absent A Preliminary Injunction, Members 1st Will Suffer Irreparable Injury For Which There Is No Adequate Legal Remedy ................................. 12

    C. The Balance of Harm Favors Members 1st ................................................. 13

    D. A Preliminary Injunction Serves the Public Interest.................................... 14

    E. If Members 1st Must Post a Bond, Any Such Bond Should Be Minimal ........... 15

IV. CONCLUSION......................................................................................................... 15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.,*
  971 F.2d 6 (7th Cir. 1992) ......................................................................................8, 12

*AutoZone, Inc. v. Strick,*
  543 F.3d 923 (7th Cir. 2008) ............................................................................8, 9, 10

*Estate of Beckwith, Inc. v. Comm'r of Patents,*
  252 U.S. 538, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ....................................................8

*CAE, Inc. v. Clean Air Eng'g, Inc.,*
  267 F.3d 660 (7th Cir. 2001) ...............................................................................8, 10

*Eli Lilly & Co. v. Natural Answers, Inc.,*
  233 F.3d 456 (7th Cir. 2000) .......................................................................8, 12, 14

*Eli Lilly and Co. v. Arla Foods, Inc.,*
  893 F.3d 375 (7th Cir. 2018) ....................................................................................6

*Forum Corp. of N. Am. v. Forum, Ltd.,*
  903 F.2d 434 (7th Cir. 1990) ..................................................................................11

*Gimix Inc. v. JS & A Grp., Inc.,*
  699 F.2d 901 (7th Cir. 1983) ....................................................................................7

*Hyatt Corp. v. Hyatt Legal Servs.,*
  736 F.2d 1153 (7th Cir. 1984) ................................................................................13

*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,*
  846 F.2d 1079 (7th Cir. 1988), *abrogation in part on other grounds*
  *recognized by*, Illinois Republican v. Pritzker, 973 F.3d 7650 (7th Cir. 2020)................6, 8, 9

*James Burrough Ltd. v. Sign of Beefeater, Inc.,*
  540 F.2d 266 (7th Cir. 1976) ....................................................................................8

*Meridian Mut. Inc. Co. v. Meridian Ins. Grp., Inc.,*
  128 F.3d 1111 (7th Cir. 1997) ................................................................................12

*Nat'l Council of Young Men's Christian Assocs. v. Human Kinetics Publs., Inc.,*
  2006 WL 752950 (N.D. Ill. Mar. 15, 2006)............................................................14

*Nike, Inc. v. "Just Did It" Enters.,*
  6 F.3d 1225 (7th Cir. 1993) ......................................................................................8

ii

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985)........................................................................................14

*Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*,
    4 F. Supp. 2d 794 (C.D. Ill. 1998) ...................................................................8

*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*,
    687 F.2d 563 (2d Cir. 1982)............................................................................14

*Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*,
    123 F. Supp. 2d 470 (E.D. Wis. 2000)............................................................12

*Processed Plastic Co. v. Warner Comm'cns, Inc.*,
    675 F.2d. 852 (7th Cir. 1982) .........................................................................13

*Promatek Indus. Ltd. v. Equitrac Corp.*,
    300 F.3d 808 (7th Cir. 2002) ......................................................................6, 15

*Rosati v. Rosati*,
    2021 WL 3666432 (N.D. Ill. Aug. 18, 2021) ..............................................6, 15

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ..........................................................................11

*Scandia Down Corp. v. Euroquilt, Inc.*,
    772 F.2d 1423 (7th Cir. 1985) ..........................................................................8

*Scherr v. Volpe*,
    466 F.2d 1027 (7th Cir. 1972) .........................................................................15

*Sorensen v. WD-40 Co.*,
    792 F.3d 712 (7th Cir. 2015) .....................................................................10, 11

*Spex, Inc. v. Joy of Spex, Inc.*,
    847 F. Supp. 567 (N.D. Ill. 1994) .....................................................................7

*Stahly, Inc. v. M. H. Jacobs Co.*,
    183 F.2d 914 (7th Cir. 1950) ...........................................................................15

*Sullivan v. CBS Corp.*,
    385 F.3d 772 (7th Cir. 2004) .............................................................................8

*Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*,
    2021 WL 472915 (D. Or. Feb. 9, 2021)...........................................................12

*Ty, Inc. v. The Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) ...........................................................8, 9, 13, 14

*Ty, Inc. v. Softbelly's Inc.*,

iii

2001 WL 125321 (N.D. Ill. Feb. 9, 2001) ...............................................................13

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*,
    698 F.2d 862 (7th Cir. 1983) ...............................................................12, 13

*World Entm't, Inc. v. Brown*,
    2011 WL 2036686 (E.D. Pa. May 20, 2011) ...............................................................7

## Statutes

15 U.S.C. § 1115...............................................................6, 10

15 U.S.C. § 1116...............................................................12

15 U.S.C. § 1065...............................................................6

## Other Authorities

Fed. R. Civ. P. 65...............................................................15

J. Thomas McCarthy,
    2 *McCarthy on Trademarks and Unfair Competition* § 11.73 (2008)...............................................................10

131757214

## I. INTRODUCTION

Members 1st Federal Credit Union ("Members 1st") seeks this Court's assistance to stop Plaintiff and Counter-Defendant M1 Holdings, Inc. ("M1 Holdings") and Counter-Defendant Lincoln Savings Bank ("Lincoln Savings") (the "Counter-Defendants") from passing off identical products and services under nearly identical marks in order to capitalize on Members 1st's name and reputation that it has earned over almost 20 years of continuous and extensive, nationwide use. Members 1st is the 47th largest credit union in the nation and the 3rd largest in Pennsylvania, and the owner of the federally registered and incontestable **M**$^{st}$ trademark for use with its services, which include, *inter alia*, checking, savings, credit and debit card services, investment services and other products and services offered by banks and credit unions, since 2003.

M1 Holdings began using the composite phrase "M1: THE FINANCE SUPER APP" for website and mobile applications for making investments in or around 2016 and filed U.S. trademark applications for that phrase. When Members 1st learned of the filings, it exchanged letters with M1 Holdings and, from such letters, Members 1st understood that M1 Holdings would continue to focus its branding on the full phrase and for the products it had filed for. M1 Holdings did not do so—later filing additional applications incorporating the text "M1," including for the **M** design and, thereafter, the **(M**$^+$**)** design. Members 1st learned of the first of these new infringing marks when the applications published and it immediately put M1 Holdings on notice of its objections to such use.

Despite discussions that ensued to amicably resolve the likelihood of confusion the usage would create between Members 1st's M1st trademark, M1 Holdings had, unbeknownst to Members 1st, continued to significantly increase the nature and manner of its infringement to

further encroach on Members 1st trademark rights. In November 2021, M1 Holdings disclosed to Members 1st that it was then actively offering banking services under the objected-to marks and, on January 17, 2022, ran a nationally televised infringing advertisement broadcast to millions of viewers on ESPN television network just prior to a Monday night NFL game. M1 Holdings' infringement is also now being conducted in partnership with Lincoln Savings and, as of February 2022, through a new infringing website, *i.e.,* www.m1.com.

Counter-Defendants' infringement has caused, and will continue to cause, a likelihood of confusion and substantial and irreparable harm to the goodwill and reputation of Members 1st and its M1st trademark that it has spent decades and significant investment to build. Without preliminary injunctive relief, Members 1st will continue to suffer damages for which it has no adequate remedy at law. Accordingly, Members 1st hereby moves for preliminary injunctive relief to preserve the prior status quo of the parties and to avoid further significant, irreparable harm stemming from Counter-Defendants' continuing infringement of Members 1st's M1st trademark.

## II.    FACTUAL BACKGROUND

### A.    Members 1st and its M1st Mark

Founded in 1950, Members 1st is a member-owned, full-service financial institution located in South Central Pennsylvania, which has operated under the name "Members 1st Federal Credit Union" since 1994. (Reimer Decl., ¶ 3.) Members 1st, which is open to anyone in the United States who falls within its field of membership, has 53 full-service branches and serves over 500,000 members. Based on total assets of over $6 billion as of December 31, 2021, Members 1st ranked as the 47th largest credit union nationally and as the third largest credit union in Pennsylvania. (*Id.*, ¶¶ 4-6.)

In March 2003, Members 1st began using its M1st trademark, which it primarily displayed

2

in the following stylized format: **M**st (the "M1st Mark"). (*Id.*, ¶ 7.) The **M**st design was intended as an extension of its name "Members 1st" in that the design mark consists primarily of a stylized letter "M," wherein the right-hand portion of the traditional "M" letter resembles a numeral "1." Members 1st is the owner of two U.S. Trademark Registrations for the **M**st mark, which are both valid and subsisting in full force and effect, and one of which has become incontestable. (*Id.*, ¶¶ 8, 9; Counterclaim, Exhibit 1.)

Members 1st has expended substantial time, money, and other resources in developing, marketing, advertising, and otherwise promoting its M1st Mark and products and services sold under it. As a result, the M1st Mark is widely and favorably known across the United States to the trade and purchasing public as exclusively identifying the sole source of the products and services offered by Members 1st. The M1st Mark signifies the high quality of the products and services designated by it, having acquired incalculable distinction, reputation, and goodwill value belonging exclusively to Members 1st. (Reimer Decl., ¶¶ 14-16.)

### B. Counter-Defendants and Their Unlawful and Willful Activities

In or around 2016, M1 Holdings began providing a website at the domain name www.m1finance.com that advertised investment services offered primarily under the name "M1 FINANCE" and subsequently advertised its related mobile application offered under the "M1 FINANCE" name. (*See* Flanagan Decl. ¶¶ 2, 5-9). On August 31, 2020, M1 Holdings filed U.S. Trademark Applications for "M1: THE FINANCE SUPER APP" in connection with providing a website and mobile application for investment services.

In October 2020, Members 1st initially learned of M1 Holdings' use of "M1: THE FINANCE SUPER APP" in connection with the products and services listed in the initial applications, and Members 1st immediately provided M1 Holdings with notice that it objected to

3

the use of "M1" on financial products and services as likely to cause consumer confusion. In particular, Members 1st's counsel immediately sent M1 Holdings a demand letter and, on October 29, 2020, M1 Holdings responded, arguing that "M1: THE FINANCE SUPER APP" is distinguishable from Members 1st's Marks because of the additional words "THE FINANCE SUPER APP." M1 Holdings' counsel also responded that Members 1st's uses of the M1st Marks were not focused on investment services like those that were offered by M1 Holdings. *See* ECF No. 1-3, 1-4. From those communications, it was Members 1st's understanding that M1 Holdings would not be offering banking services under any mark that included the text "M1", and that it would primarily be using the "M1: THE FINANCE SUPER APP" mark to offer its website and mobile application for use with investment services. (Reimer Decl., ¶¶ 17-19.)

However, on November 18, 2020, M1 Holdings filed three new trademark applications seeking to register the  designation and, in May and July 2021, five additional applications seeking to register the  designation. The last set of applications from May and July 2021 incorporated even more expansive categories of financial products and services. (*Id.*, ¶¶ 2-4.)

In or around June 9, 2021, Members 1st first learned of the three additional trademark applications filed by M1 Holdings for the  design for various categories of products and services relating to investment services because the applications were published for objection by third parties. Thereafter, in June 2021, Members 1st filed an extension to object through its counsel and then settlement discussions began between Members 1st and M1 Holdings. While settlement discussions were ongoing, Members 1st believed that the parties were working in a good faith attempt to resolve the matter in a way that would avoid consumer confusion and, thus, that both parties would continue to maintain the status quo that had existed. (*Id.*, ¶ 20.)

4

Yet, contrary to that status quo, in November 2021, M1 Holdings disclosed to Members 1st's counsel that M1 Holdings was actively offering not only a website and mobile application for investment services but was now offering banking services under the designations M1, **M** and  (the "Infringing Marks"). Thereafter, Members 1st began further investigation of M1 Holdings' actual marketplace uses of the Infringing Marks and the products and services being offered thereunder, and the extent of the same. (*Id*., ¶¶ 21-22.) On January 17, 2022, M1 Holdings ran a televised advertisement that was broadcast to millions of viewers on ESPN. (*Id*., ¶ 23.) Based upon further investigation in the subsequent weeks, Members 1st also learned that M1 Holdings had partnered with Lincoln Savings to provide M1 Holdings' customers with traditional banking services, including checking accounts, and credit and debit cards under the Infringing Marks. (*Id*., ¶ 24; *see also* Flanagan Decl., ¶¶ 9-12.) In February 2022, M1 Holdings also expanded the online advertising of its services from the domain www.m1finance.com to redirect consumers to the website branded solely as "M1" at www.m1.com. (*See id.,* ¶¶ 5-8.)

In light of the foregoing, on February 11, 2022, Members 1st sent demand letters to Counter-Defendants, noting it was a final attempt to come to an amicable resolution. (*see id*.) In response, M1 Holdings made it clear that it and Lincoln Savings had no intention of stopping or slowing the continuing willful infringement. Specifically, in an apparent attempt to bully Members 1st, to make its conduct look less egregious and unlawful, and/or for the purposes of simple forum shopping, M1 Holdings filed its Complaint in this action, seeking declaratory judgment of non-infringement. Given the immediate and irreparable harm and injury to Members 1st if M1 Holdings and Lincoln Savings are permitted to continue their expansive willful infringement of Members 1st's trademark rights for the duration of this lawsuit, Members 1st was left with no other option but to file this motion and seek immediate injunctive relief. (Reimer Decl.*,* ¶¶ 27-29.)

5

## III.     A PRELIMINARY INJUNCTION IS WARRANTED

Members 1st is entitled to a preliminary injunction because (1) it has demonstrated a strong "likelihood of success on the merits," (2) "without preliminary relief, it will suffer irreparable harm before final resolution of its claims," and (3) "legal remedies are inadequate." *Eli Lilly and Co. v. Arla Foods, Inc*., 893 F.3d 375, 381 (7th Cir. 2018) (requiring only "some likelihood of success on the merits" for preliminary relief). Further, a preliminary injunction is warranted because (1) the balance of hardships weighs in Members 1st's favor, particularly because any hardship Counter-Defendants may suffer is self-imposed, and (2) the public interest in avoiding confusion favors preliminary relief.[1] *Id.; Promatek Indus. Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813-814 (7th Cir. 2002) (affirming preliminary injunctive relief, holding evidentiary hearing was not required).

### A.     The Counterclaims Have a High Likelihood of Success on the Merits

Members 1st has a strong likelihood of success on the merits of its state and federal trademark infringement, false designation of origin and unfair competition counterclaims.[2]  To prevail in this action, Members 1st must establish: "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988), *abrogation in part on other grounds recognized by*, *Illinois Republican v. Pritzker*, 973 F.3d 7650 (7th Cir. 2020) (internal citations and quotation marks omitted).[3]  As discussed below, these elements are met in this case.

---

[1] *See Rosati v. Rosati*, 2021 WL 3666432, at *12 (N.D. Ill. Aug. 18, 2021) (granting preliminary injunction and stating that there is a public interest in protecting the rights of registered trademark holders and preventing consumer confusion).

[2] Members 1st has also asserted two claims for cancellation of U.S. trademark registrations against Counter-Defendant M1 Holdings, a claim under common law trademark infringement and unfair competition, and a claim under the Illinois Uniform Deceptive Trade Practices Act against both Counter-Defendants. (*See* Counterclaim)

[3] At this stage, Members 1st need only demonstrate that it has a "better than negligible" chance of succeeding on the merits so that injunctive relief would be justified. *Id.*  Further, each of the trademark infringement, unfair competition counterclaims, and unfair trade practices claims involve essentially the

6

### 1. Members 1st's M1st Mark is Protectable and Incontestable

Under federal law, a federal trademark registration "shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods and services specified in the registration." 15 U.S.C. § 1115(a). Thus, Members 1st's federal registrations (U.S. Reg. Nos. 3055347 and 6349066) for the trademark $M^{st}$ constitute prima facie evidence of Members 1st's rights in those marks. (Reimer Decl., Ex. 1[4]; Counterclaim, Exhibit 1.) The registrations are both valid and subsisting, in full force and effect, and U.S. Trademark Registration No. 3055347 has become incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065. *See id.* Additionally, for nearly two decades, Members 1st has continuously used the marks in interstate commerce and has spent millions of dollars per year in advertising its products and services under the M1st Mark. Members 1st's products and services branded with the M1st Mark are offered to Members 1st's over 500,000 members through 53 full-service branches and online through its website. As of December 31, 2021, Members 1st ranked as the 47th largest credit union nationally. It is also ranked as the 3rd largest credit union in Pennsylvania. (Reimer Decl., ¶¶ 5-6, 10-16.)

Members 1st clearly satisfies the first element required to demonstrate likelihood of success—the M1st Mark is not only protectable, but well known to customers nationwide who understand it to exclusively identify Members 1st and its products and services.

---

same elements and proofs. *See Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) (citing *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 908 (7th Cir. 1983) (holding, "[c]laims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act," and noting that "Illinois courts look to federal case law and apply the same analysis to state infringement claims."); *World Entm't, Inc. v. Brown*, 2011 WL 2036686, at *2 (E.D. Pa. May 20, 2011) ("The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act.") (citation omitted).

[4] "Ex." shall refer to the exhibits attached to the Reimer and Flanagan Declarations, filed herewith.

7

## 2.    A Likelihood of Confusion Exists

As demonstrated below, there is a significant likelihood of confusion resulting from Counter-Defendants' use of the Infringing Marks, strongly favoring entry of the injunction.[5]

*(1) Similarity of the Marks:*  To determine whether two marks are similar, the Court views the marks as a whole. *See Estate of Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-546, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ("The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail."); *see also Scandia Down Corp. v. Euroquilt, Inc*., 772 F.2d 1423, 1431 (7th Cir. 1985). Thus, the court should "consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993).[6]  Here, M1 Holdings' marks of M1,  and , are almost identical to

---

[5] In the Seventh Circuit, the following seven factors are used to analyze whether there is a likelihood of confusion in trademark infringement cases: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and, (7) the intent of the defendant to 'palm off' his product as that of another." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008)). "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001). "[A] plaintiff is not required to establish all of these factors; rather, the appropriate weight which the court should give to each factor should be made on a case-by-case basis." *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 794, 801 (C.D. Ill. 1998).  With respect to the fourth factor, while consumers may be more careful in selecting a financial services provider, it does not mean that they would not be confused as to the affiliation between two financial companies whose brands both contain the text "M1" as their primary component.  With respect to the sixth factor, Members 1st is not required to show actual confusion, particularly at the preliminary injunction stage, in order to prove a likelihood of confusion. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 22 n. 7 (7th Cir. 1992); *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) (Evidence of actual confusion is not required to prove that a likelihood of confusion.)  Nor does a plaintiff need to produce consumer survey evidence at the preliminary injunction stage. *Int'l Kennel Club*, 846 F.2d at 1086.

[6] We must compare the marks "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (quoting *Ty, Inc. v. The Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)).[6]  "[T]he test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976).

131757214

Members 1st's M1st Mark: .

The Infringing Marks and the M1st Mark both use "M1" and are highly similar in sight and sound. Further, the stylized Infringing Marks ( and ) and stylized M1st Mark (), consist primarily of a stylized letter "M," wherein the right-hand portion of the traditional "M" letter resembles a numeral "1." The differences between the respective marks are negligible as both contain the identical and dominant text "M1." Indeed, M1 Holdings initially used "M1: THE FINANCE SUPER APP" for its products and services, and had previously argued that its mark was distinguishable because of the additional words of "THE FINANCE SUPER APP" added to "M1." (Reimer Decl., ¶¶ 18-19.) But M1 Holdings has since removed the additional wording, moving even closer to Members 1st's M1st Mark. Given the lack of differences, it would be difficult for a consumer to distinguish between the marks in the marketplace. Thus, the similarity factor weighs strongly in favor of a likelihood of confusion.

*(2) Similarity of the Products/Services:* The products and services offered by both Members 1st and Counter-Defendants are also closely related and overlapping, which would further confuse consumers. *Ty, Inc.*, 237 F.3d at 899-900.[7] The services offered with M1 Holdings' uses of the Infringing Marks on investment services are highly similar to and overlapping with

---

[7] "[A] closely related product [or service] is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* at 900. To be closely related, products or services need not be identical or in direct competition. Rather, the products or services must be "the kind the public might very well attribute to a single source." *Int'l Kennel Club*, 846 F.2d at 1089 (finding plaintiff who sponsored dog shows and defendant who created dog toys offered related products). *See AutoZone, Inc.*, 543 F.3d at 931 (ruling that a reasonable consumer could conclude that plaintiff's automobile products and defendant's automobile services came from the same source).

Members 1st uses its M1st Mark on credit union services, which also include investment services. M1 Holdings' recent expansion of its services, through a partnership with Lincoln Savings, to include checking, credit and debit card account services bridged the already very narrow gap (if any) that existed between Members 1st and M1 Holdings' products and services. Given this, Counter-Defendants' use of the Infringing Marks has significant potential to create confusion among consumers as to the source of the products and services that Counter-Defendants offer under them. Counter-Defendants have attempted to pass off identical products and services in order to capitalize on Members 1st's brand, reputation and M1st Mark as demonstrated by their almost wholesale copying of the design of Members 1st M1st Mark. Thus, this factor weighs strongly in favor of the likelihood of confusion.

*(3) Area and Manner of Concurrent Use:* The parties promote their services nationally "in the same channels of commerce" and "have targeted the same general audience" – namely, persons seeking investment and banking products and services. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681-82 (7th Cir. 2001) (the third factor looks to "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties."); *see also AutoZone, Inc.*, 543 F.3d at 932. Thus, this factor also weighs in favor of a likelihood of confusion.

*(4) Strength of the M1st Mark:* The strength of a trademark "refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Sorensen v. WD-40 Co.,* 792 F.3d 712, 731 (7th Cir. 2015).[8] Here, Members 1st's M1st Mark is arbitrary as applied to its goods and services and as such, is inherently distinctive and considered a strong trademark. And the M1st Mark, which Members 1st has

---

[8] "The stronger the mark, the more likely it is that encroachment on it will produce confusion." J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 11.73, at 11-169 to 170 (2008).

extensively advertised for almost 20 years, is widely and favorably known across the US to the trade and purchasing public to exclusively identify the sole source of the products and services offered by Members 1st and to signify the high quality of the products and services designated by the mark.[9] (Reimer Decl., ¶¶ 10-16, 27-29.). As such, Members 1st's M1st Mark is strong.

(5) *Counter-Defendants' Intent:* In assessing intent, courts look at if the "defendant is attempting to pass off its product as having come from the plaintiff." *Sorensen*, 792 F.3d at 731. It is the "second user's responsibility to avoid confusion in its choice of a trademark," a responsibility that includes "choosing a mark whose salient portion would not likely be confused with a first user's mark." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 440 (7th Cir. 1990).[10] Given Counter-Defendants' industry experience, Members 1st's extensive nationwide marketing, Members 1st's use of the M1st Mark for about 12 years before M1 Holdings existed (and for nearly 2 decades before M1 Holdings' and Lincoln's recent expansion into banking services) and the high similarity in design between the marks, it can be inferred that Counter-Defendants M1 Holdings designed the Infringing Marks with the intent to mislead consumers into believing that M1 Holdings and its business partner Lincoln Savings are somehow affiliated with Members 1st. Even more egregious, and further confirmation of Counter-Defendants' ill intent, is M1 Holdings' purposeful expansion of the manner and extent of the uses of the Infringing Marks, as well as the categories of services, through its partnership with Lincoln Savings. Indeed, Counter-Defendants' purposely undertook these actions, while knowingly encroaching on Members 1st's primary sphere of business. Counter-Defendants' intentions are clear—adopt a nearly identical trademark

---

[9] Further, U.S. Trademark Reg. No. 3055347 for the **M''** design mark is incontestable and, thus, it is conclusively presumed that such M1st Mark is inherently distinctive under 15 U.S.C. § 1115(b).

[10] In some circumstances, an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained notoriety. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992).

11

and provide overlapping services in order to trade off the goodwill, distinction and reputation of Members 1st, which is the 47th largest credit union in the country, its brand and the products and services it offers. This factor overwhelmingly favors Members 1st.

Given the similarity of the marks, the overlap of services, channels of trade and targeted consumers, and the Counter-Defendants' ill intentions, Members 1st is highly likely to succeed on the merits of its counterclaims.

**B. Absent A Preliminary Injunction, Members 1st Will Suffer Irreparable Injury For Which There Is No Adequate Legal Remedy**

The Trademark Modernization Act of 2020 ("TMA") amended the Lanham Act's injunctive relief provisions to read:

> . . . A plaintiff seeking any such injunction **shall be entitled to a rebuttable presumption of irreparable harm** upon a finding . . . of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction . . .

15 U.S.C. § 1116(a) (emphasis added).[11] Here, because Members 1st has shown a likelihood of success on the merits, Members 1st is entitled to a presumption of irreparable harm. Even if the presumption did not apply, without injunctive relief, Members 1st will suffer irreparable harm in the form of loss of goodwill and damage to its reputation.[12] Absent an injunction, Counter-

---

[11] *See Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 2021 WL 472915, at *12, n.12 (D. Or. Feb. 9, 2021) ("The italicized portion of § 1116(a) was added by Congress effective December 27, 2020 in the Trademark Modernization Act of 2020, which was part of the Consolidated Appropriations Act, 2021. See Pub. L. 116-260, § 226, 134 Stat. 2208 (2020)."); *see also Eli Lilly & Co.*, 233 F.3d at 469 (affirming district court's assessment of the remaining preliminary injunction issues and recognizing the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss") (citing *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992)).

[12] "[T]he Seventh Circuit recognizes the loss of goodwill as an irreparable harm" in the context of a preliminary injunction analysis. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 123 F. Supp. 2d 470, 479 (E.D. Wis. 2000); *see also Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997). Further, the "loss of control over [one's] reputation justifies a finding of irreparable harm even if it could demonstrate no loss of sales or market share." *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). The Seventh Circuit has expressly acknowledged that "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the

12

Defendants will be able to freely pass off identical products and services under almost identical marks in order to capitalize on Members 1st's brand and reputation, leaving consumers confused as to whether Counter-Defendants' products and services are affiliated with Members 1st or are otherwise sponsored by Members 1st. This, in turn, will erode Members 1st's ability to control its brand's reputation and what consumers are likely to perceive about the goods and services offered under its own M1st Mark. (Reimer Decl., ¶¶ 27-29). The only way to prevent this irreparable harm is to enjoin Counter-Defendants from continuing to use the Infringing Marks.[13]

### C. The Balance of Harm Favors Members 1st

Courts in the Seventh Circuit apply a "sliding scale" analysis when balancing the harms associated with a request for preliminary injunctive relief. *Ty, Inc.*, 237 F.3d at 895. That is, "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id*. Here, Members 1st has a strong likelihood of success on the merits of its counterclaims. This in and of itself warrants granting Members 1st's Motion.

Moreover, any harm to Counter-Defendants if they are enjoined from using the Infringing Marks is negligible and of Counter-Defendants' own making. Counter-Defendants knowingly expanded the categories of services offered and encroached on Members 1st's primary area of business with the intent to trade off the goodwill, distinction and reputation of Members 1st's brand and its M1st Mark. *Ty, Inc. v. Softbelly's Inc.*, 2001 WL 125321, at *8 (N.D. Ill. Feb. 9, 2001) (discounting the "obvious" harm to defendant "if it is enjoined from the sale of its product" because "[i]t is obvious that [defendant] had knowledge of [plaintiff's] mark and product but still chose to

---

victim to control the nature and quality of the defendant's goods." *Processed Plastic Co. v. Warner Comm'cns, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982).
[13] *Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1158 (7th Cir. 1984); *Processed Plastic*, 675 F.2d at 858 (damages resulting from trademark infringement are "by their very nature irreparable and not susceptible of adequate measurement for remedy at law").

continue down this path").[14]  When weighing the harm posed by an injunction, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk."  *Ty*, 237 F.3d at 903.

Additionally, any financial burden that Counter-Defendants allege in order to cease all use and remove references to the Infringing Marks should be excluded from the Court's analysis.  *Nat'l Council of Young Men's Christian Assocs. v. Human Kinetics Publs., Inc.*, 2006 WL 752950, at *7 (N.D. Ill. Mar. 15, 2006) ("[O]ne entering a field . . . has a duty to select a mark that will avoid confusion, [and] one who fails in this duty cannot later complain that having to mend its ways will be too expensive.") (citation omitted).  Here, Counter-Defendants had knowledge of Members 1st, its M1st Mark, and its products and services.  Further, they were aware of Members 1st's objection to their initial use of the Infringing Marks yet continued to pursue their path of expansion. Counter-Defendants have no one but themselves to blame for any costs or burden incurred. As they will not face any real financial hardship that was not self-inflicted, and the injunction is needed to protect Members 1st from cognizable irreparable harm to its reputation and goodwill while this Court resolves the merits of claims on which Members 1st is clearly likely to prevail, the "sliding scale" analysis applied by this Court weighs in favor of entering a preliminary injunction.

### D.     A Preliminary Injunction Serves the Public Interest

Granting Members 1st's Motion also serves the public interest because an injunction would prevent ongoing and consumer confusion.[15]   Currently, consumers are being given the false

---

[14] *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 687 F.2d 563, 567 (2d Cir. 1982) (the knowing user of a confusingly similar mark misses the opportunity to avoid conflict and takes a calculated risk at its own peril).

[15] *Eli Lilly & Co.*, 233 F.3d at 469 ("[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion."); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985) ("Because trademarks desirably promote competition and the maintenance of product quality, Congress determined that a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them.") (quotation omitted); *Stahly, Inc. v. M. H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950) ("It must be remembered that the trade-mark laws . . . are concerned

14

impression that Counter-Defendants' goods and services are provided by Members 1st and that Members 1st has approved, sponsored, or otherwise associated itself with Counter-Defendants. Unless Counter-Defendants' ongoing (and expanding) use of the Infringing Marks is immediately enjoined, the public interest is not adequately served. *See e.g., Promatek,* 300 F.3d at 814 (finding public interest weighed in favor); *Rosati,* 2021 WL 3666432, at *12 (same).

### E. If Members 1st Must Post a Bond, Any Such Bond Should Be Minimal

Rule 65(c), Fed. R. Civ. P., provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond, if any, is left to the discretion of the Court and, where there is a strong likelihood of success on the merits, it is not error for the Court to decline to require the movant to post a security bond. *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). To the extent a bond is required, the amount should be minimal. Members 1st does not seek to enjoin Counter-Defendants from continuing to offer their products and services, but rather to prevent them from using the Infringing Marks to do so. Here, the potential damages if an injunction is improperly entered are nominal, eliminating any need for a bond.

## IV. CONCLUSION

For the foregoing reasons, Members 1st respectfully requests that this Court grant its motion for a preliminary injunction.

---

not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit.").

15

Dated: March 23, 2022     Respectfully submitted,

/s/ Adam Wolek
Adam Wolek
Patricia M. Flanagan
(*pro hac vice forthcoming*)
Fox Rothschild LLP
777 South Flagler Drive
Suite 1700, West Tower
Telephone: (312) 517-9299
Facsimile: (312) 517-9201
awolek@foxrothschild.com
pflanagan@foxrothschild.com

*Attorneys for Defendant/Counter-Claimant*

16

131757214

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on March 23, 2022, I filed the foregoing DEFENDANT AND COUNTER-CLAIMANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court via CM/ECF, which provided notice of same to all parties and/or counsel who have made an appearance in this case.

Dated: March 23, 2022                              /s/ Adam Wolek
                                                   Adam Wolek

131757214