UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M1 HOLDINGS INC.,

        Plaintiff,

v.

MEMBERS 1ST FEDERAL CREDIT
UNION,

        Defendant.

No. 22-cv-01162
Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Plaintiff M1 Holdings Inc. (M1 Holdings) brings this action against Defendant Members 1st Federal Credit Union (Members 1st) seeking a declaratory judgment that M1 Holdings' trademarks and brand identifiers do not infringe Members 1st's design mark bearing Registration No. 3,055,347. Members 1st has filed a counterclaim against M1 Holdings and Lincoln Savings Bank (Lincoln Savings) (collectively, Counter-Defendants[1]) for trademark infringement, false designation of origin, unfair competition, and deceptive acts and practices pursuant to the Lanham Trademark Act of 1946 (the Lanham Act), 15 U.S.C. § 1051, *et seq.*, and Pennsylvania and Illinois law. Before the Court is Members 1st's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), asking the Court to order Counter-Defendants to cease any use of their allegedly infringing marks in connection with financial products and services similar to those offered by Members

---

[1]Because Lincoln Savings wholly joins and adopts the arguments set forth by M1 Holdings, *see* R. 29, the Court refers only to M1 Holdings throughout its forthcoming analysis.

1st. R. 13, Mot. For the following reasons, the motion for preliminary injunction [13] is denied.

## Background[2]

Counter-Plaintiff Members 1st is a member-owned financial institution and credit union located in South Central Pennsylvania. R. 14, Memo. at 7. With over $6 billion in assets, it is the 47th largest credit union in the nation and the 3rd largest in Pennsylvania. *Id.* It has 53 full-service branches, serves over 500,000 members, and offers investment and banking products and services, including checking, savings, and credit and debit cards. *Id.* at 6. Counter-Defendant M1 Holdings is a Chicago-based financial company formed in 2016 that offers mobile and web-based digital financial goods and services. R. 30, Resp. at 3. According to M1 Holdings, its name is a reference to a term for a measure of the money supply which is well-known throughout the financial industry. *Id.*

Since 2003, Members 1st has marketed its credit union services with its design trademark bearing Registration No. 3,055,347, primarily in the following stylized format of a letter "M," wherein the right-hand portion of the letter resembles a numeral "1":



---

[2]This background is taken from the complaint and the parties' briefs and submissions regarding the motion for preliminary injunction.

(the M1st Mark). Memo. at 7–8. Members 1st owns two valid U.S. Trademark Registrations for the M1st Mark, one for charitable services and one for credit union services. *Id.* at 8 (citing R. 14-1, Reimer Decl. ¶¶ 8–9). It has used the M1st Mark continuously and extensively for approximately 20 years, expending substantial time and millions of dollars to develop, market, advertise, and promote its products and services with the mark. *Id.* at 6, 8. Members 1st claims that its mark signifies the high quality of its products and services, which have acquired incalculable distinction and reputation. *Id.* at 8.

According to Members 1st, in or around 2016, M1 Holdings began (1) advertising investment services at the domain name www.m1finance.com and (2) using the composite phrase "M1: THE FINANCE SUPER APP" for website and mobile investment applications. Memo. at 6, 8. On August 31, 2020, M1 Holdings filed trademark applications for that phrase in connection with providing a website and mobile application for investment services. *Id.* at 8. In October 2020, Members 1st learned of M1 Holdings' use of that phrase, and exchanged letters with M1 Holdings objecting to M1 Holdings' use of the phrase with regard to financial products and services. *Id.* at 8–9. On October 29, 2020, M1 Holdings responded to Members 1st, arguing that the phrase was distinguishable from the M1st Mark because (1) it used the additional words "THE FINANCE SUPER APP" and (2) the M1st Mark was not used in conjunction with investment services like those offered by M1 Holdings. *Id.* at 9. Members 1st maintains that, as a result of its exchange with M1 Holdings, Members 1st understood that M1 Holdings would continue to focus its branding on

the full phrase "M1: THE FINANCE SUPER APP" and would only offer financial investment services under any mark using the text "M1"—*not* banking services. *Id.* at 6, 9.

However, M1 Holdings later filed additional trademark applications that did not use the full phrase. On November 18, 2020, M1 Holdings filed three new trademark applications seeking to register the following designation:



(the M1 Mark). Memo. at 9. In May and July 2021, M1 Holdings filed five additional applications seeking to register the following designation:



(the M1 Plus Mark) (collectively, the M1 Marks). *Id.*

Members 1st claims that it first learned of M1 Holdings' three trademark applications for the M1 Mark on or about June 9, 2021, when the applications were published for objection by third parties. Memo. at 9. Members 1st responded by filing for an extension to object to the application. *Id.* The parties subsequently began settlement discussions. *Id.* Further, says Members 1st, after it had been working with M1 Holdings in a good faith attempt to resolve the matter, M1 Holdings told Members

1st in November 2021 that M1 Holdings was actively offering banking services—in addition to investment services—under the M1 Marks. *Id.* at 10.

Members 1st then began further investigation into M1 Holdings' use of the M1 Marks. Memo. at 10. On January 17, 2022, M1 Holdings ran a nationally televised advertisement on the ESPN television network using the M1 Marks. *Id.* In the weeks after that advertisement, Members 1st learned that M1 Holdings had partnered with Lincoln Savings to provide M1 Holdings' customers with traditional banking services, including checking accounts and credit and debit cards, under the M1 Marks. *Id.* Finally, in February 2022, M1 Holdings began using the M1 Marks through a new website, www.m1.com. *Id.*

Due to these developments, on February 11, 2022, Members 1st sent demand letters to Counter-Defendants as a final attempt to come to an amicable solution. Memo. at 10. M1 Holdings thereafter filed its complaint in this action, seeking declaratory judgment of non-infringement. *Id.* Approximately 20 days later, Members 1st filed the present motion for preliminary injunction.

**Legal Standard**

A preliminary injunction is "an extraordinary and drastic remedy" to be granted only if the movant carries the burden of persuasion "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). As an equitable, interlocutory measure, it involves the "exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Impact Networking, LLC v. Impact Tech. Sols., Inc.*, 2018 WL 1469004, at *4 (N.D. Ill. Mar. 26, 2018) (quoting *Winter v. Nat.*

5

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). In addition, mandatory preliminary injunctions are "ordinarily cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

A party seeking a preliminary injunction is required to demonstrate (1) a likelihood of success on the merits, (2) that it has no adequate remedy at law, and (3) that it will suffer irreparable harm if the relief is not granted. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002), *as amended* (Oct. 18, 2002). The Seventh Circuit recently clarified *how likely* success on the merits must be in order to satisfy the standard. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). There, the court explained that a "possibility of success is not enough" and "[n]either is a better than negligible chance." *Id.* (internal citations and quotations omitted). But the moving party "need not show that it definitely will win the case." *Id.* at 763. "A strong showing" of a likelihood of success on the merits thus "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* (internal citations and quotations omitted).

If a movant "cannot satisfy any one of these threshold showings, the court's inquiry ends, and a preliminary injunction will not be issued. The court may deny [the movant's] request for a preliminary injunction without a hearing if it concludes as a matter of law that [the movant's] allegations, even if proven, are insufficient to support the issuance of a preliminary injunction." *Piekosz-Murphy v. Bd. of Educ. of Cmty. High Sch. Dist. No. 230*, 858 F. Supp. 2d 952, 961–62 (N.D. Ill. 2012) (citing

*Schlosser v. Commonwealth Edison Co.*, 250 F.2d 478, 480–81 (7th Cir. 1958); 11A Charles A. Wright et al., Federal Practice & Procedure § 2949; 13 James Wm. Moore et al., Moore's Federal Practice—Civil § 65.21)).

If the moving party meets this three-element threshold showing, the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quoting *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council*, 549 F.3d at 1086 (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (citing *Planned Parenthood*, 896 F.3d at 816). Finally, the Court must consider the public interest in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## Analysis

### I.    M1 Holdings' Motion for Leave to File Sur-Response Instanter

As a threshold matter, the Court grants M1 Holdings' motion for leave to file a sur-response instanter. *See* R. 32-1, Sur-Resp. A sur-response is appropriate here because Members 1st's Reply (1) cites to new declarations (R. 31-1, 31-11) and (2) uses 27 single-spaced footnotes to make multiple pages worth of argument. *See* R. 31, Reply. This Court has explained it its standing order that "[g]enerally, the Court will not consider substantive arguments contained in footnotes. This includes the distinguishing of cases relied upon by the opposing party." Case Procedures of the Hon. Franklin U. Valderrama, "Memorandum of Law Requirements." Accordingly, the Court accepts and will consider M1 Holdings' sur-response in deciding this motion.

### II.    Likelihood of Success on the Merits

To prevail in this action under the Lanham Act, Members 1st must establish: "(1) that it has a protectible trademark, and (2) a 'likelihood of confusion' as to the origin of [M1 Holdings'] product." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988) (citation omitted); *Impact Networking, LLC v. Impact Tech. Sols., Inc.*, 2018 WL 1469004, at \*5 (N.D. Ill. Mar. 26, 2018).

The Court assesses Members 1st's likelihood of success as to all of its claims (for trademark infringement, false designation of origin, unfair competition, and deceptive acts and practices) together, because they involve essentially the same elements. *See Mechling v. Operator of Website Muaythaifactory.com*, 2021 WL

3910752, at *3 (N.D. Ill. Sept. 1, 2021) ("The same two-factor analysis [in a Lanham Act trademark infringement suit] applies to claims for false designation of origin."); *Brithric Enterprises, LLC v. Bay Equity LLC*, 2021 WL 1208957, at *3 (N.D. Ill. Mar. 31, 2021) ("The elements required to prove a [Illinois Uniform Deceptive Trade Practices Act] cause of action overlap with the elements of a Lanham Act claim" and the "elements of an [Illinois Consumer Fraud and Deceptive Business Practices Act] claim 'are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception.'") (citation omitted); *World Entm't, Inc. v. Brown*, 2011 WL 2036686, at *2 (E.D. Pa. May 20, 2011) ("The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act.") (citation omitted); *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) (citing *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)).

### A.    Protectible Trademark

A federal trademark registration is "prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration[.]" 15 U.S.C. § 1115. Members 1st contends that its federally registered trademark of the M1st Mark (specifically Registration No. 3,055,347) is now incontestable, and thus immune from challenge, because it has been used for five consecutive years. Memo. at 6; *see Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456,

461 (7th Cir. 2000) ("Because Lilly registered the . . . mark in 1985 and has used it continuously for more than 5 years, it is incontestable.") (citing 15 U.S.C. § 1065).

M1 Holdings argues that Members 1st has abandoned the M1st Mark in favor of a new design, and so fails to establish that the M1st Mark is protectible. Resp. at 10 (citing 15 U.S.C. § 1115(b)(2) ("[s]uch conclusive evidence of the right to use the registered mark shall be subject" to the defense "[t]hat the mark has been abandoned by the registrant")). Specifically, in 2020, Members 1st adopted the following rebranded design of its mark:



Resp. at 5 (citing Members 1st's use of the rebranded mark in a different case, *Members 1st Federal Credit Union v. 206 Design LLC et al.*, Case No. 1:22-cv-00225 (M.D. Pa.)). The new design is different in that: (1) it is narrower, (2) it has only one serif in its top left corner, (3) the "st" in the right corner is smaller, and (4) the gap between the "1" and the letter "M" is smaller. *Id.* at 5–6.

M1 Holdings reasons that because Members 1st abandoned the original M1st Mark, the M1st Mark is only protectible if Members 1st can meet the "extremely strict" standard for "tacking." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1160 (9th Cir. 2009). Tacking means that a trademark owner like Members 1st "may claim priority in a mark based on the first use date of a similar, but technically distinct, mark—but only in the exceptionally narrow instance where the previously used mark is the legal equivalent of the mark in question or indistinguishable

therefrom such that consumers consider both as the same mark." *Id.* (internal quotation marks and citation omitted). M1 Holdings insists that Members 1st fails to show that the new design creates "the same, continuing commercial impression" as the original M1st Mark, so the new mark is neither incontestable nor protectible. Resp. at 10.

Members 1st retorts that it never abandoned the M1st Mark. Reply at 12 (citing *Persis Int'l, Inc. v. Burgett, Inc.*, 2012 WL 4176877, at *4 (N.D. Ill. Sept. 18, 2012) ("A party seeking to show that a mark owner has abandoned the mark must show actual cessation of use as well as intent not to resume using the mark.")). While Members 1st admits that it started using the updated version in August 2020, Members 1st still uses the old version as well. Reply at 9–10 (alleging that 85% of its retail locations still use signage that includes the original M1st Mark). Further, Members 1st argues that the two versions are legally equivalent, as demonstrated by the fact that the U.S. Patent and Trademark Office (USPTO) accepted the updated version as support for the issuance of M1st Mark Registration No. 6,349,066, which registered the M1st Mark for the purpose of charitable services. Reply at 9–10.

The Court finds that Members 1st has the better of the argument. Importantly, Members 1st still widely uses the mark, so it is not abandoned. M1 Holdings argues that Members 1st's claim that 85% of its physical locations—which are entirely located in Pennsylvania—still use the old mark does not show that the old mark is being used in *interstate* commerce. Reply at 4. However, M1 Holdings cites no case

law to support the notion that Members 1st must use the original mark outside of Pennsylvania for it to remain protectible.

M1 Holdings also exaggerates the differences between the original and new designs. As Members 1st argues, its registrations do not claim color, so it is free to use any colors to support its registration. Trademark Manual of Examining Procedure § 807.14(e)(i) ("If a mark is initially depicted in a black-and-white special form drawing in which no color is claimed, the drawing is presumed to contemplate the use of the mark in any color, without limitation.") (citing *Application of Data Packaging Corp.*, 453 F.2d 1300, 1302, 172 U.S.P.Q. 396, 397 (C.C.P.A. 1972)). And aside from a change to a red background, the new mark is nearly indistinguishable, such that a customer would likely consider it the same mark. M1 Holdings also cites only to one, out-of-circuit case in support of its argument that the Court should apply the tacking standard of law. Resp. at 8 (citing *One Indus.*, 578 F.3d at 1160). That case, however, is distinguishable. In *One Indus*, the issue was the similarity of two marks consisting of the letter "O", each of which was depicted in a different stylized format. *One Indus.*, 578 F.3d at 1156, 1161. The Ninth Circuit found that the standard for tacking was not met where (1) the "apostrophes are markedly different," (2) two "horizontal lines . . . are thinner than the corresponding lines" on the other mark, and (3) one mark is "boxy" while the other "looks like the outline of a lemon." *Id*. at 1161. A valid registration of a trademark is prima facie evidence of a protectible mark, and the Court finds M1 Holdings' abandonment argument unpersuasive, given

Members 1st's continued use of the original mark and the similarity of the new design. Members 1st has established that its trademark is protectible at this stage.

### B.    Likelihood of Confusion

"To decide if there is a likelihood of confusion, we ask whether consumers who might use either product would likely attribute them to a single source." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 425 (7th Cir. 2019). Likelihood of confusion is a question of fact, analyzed by considering seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products or services; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of Members 1st's mark; (6) actual confusion; and (7) whether M1 Holdings intended to palm off its product or service as that of Members 1st. *Impact Networking*, 2018 WL 1469004 at *6 (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001)). "No one factor is dispositive. Usually, however, the similarity of the marks, the defendant's intent, and actual confusion are most important." *Uncommon*, 926 F.3d at 425 (internal quotation marks and citations omitted); *see CAE*, 267 F.3d at 686–87 (the Court "must give appropriate weight to the factors that are particularly important based on the facts of each case"). The Court will analyze each factor in turn. After considering the totality of the circumstances and weighing all of the factors, the Court concludes that consumers are not likely to be confused.

### 1. Similarity of Marks

If a junior mark is similar to a senior mark, there is an increased likelihood of confusion, and marks "are troublingly similar if a consumer viewing one party's mark would likely associate the product with the other party's product." *Uncommon*, 926 F.3d at 425–26. When examining the similarity of marks, the Court examines the marks as a whole, including "sound, sight and meaning." *Henri's Food Prod. Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983). "[W]e make the comparison 'in light of what happens in the marketplace and not merely by looking at the two marks side-by-side.'" *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (citation omitted); *see James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976) ("[T]he test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected."). "It is 'inappropriate to focus on minor stylistic differences to determine if confusion is likely' if the public does not usually encounter the two marks together." *Sullivan*, 385 F.3d at 777 (quoting *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997)).

Members 1st characterizes the marks as almost identical. It highlights that both use a stylized letter "M" that breaks on the right-hand portion to create a numeral "1." This, it says, is the dominant element of both marks. Memo. at 13–14 (citing *Sullivan*, 385 F.3d at 777 ("[I]f one word or feature of a composite trademark

14

is the salient portion of the mark, it may be given greater weight than the surrounding elements.") (citation omitted)).

In response, M1 Holdings first argues that the M1st Mark is a design mark, limited to its special form, and cannot preclude every use of "M1" in a word mark form. Resp. at 11 (citing 37 C.F.R. § 2.52 and *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005) ("Trademark protection of a sufficiently stylized version of a common shape or letter will not hamper effective competition because competitors remain free to use nonstylized forms or their own alternative stylizations of the same shape or letter to communicate information about their products.")). Next, M1 Holdings points to numerous differences between the marks. It emphasizes the prominent superscript "st" in the top right corner of the M1st Mark, which is absent in the M1 Marks. Resp. at 11 (citing *One Indus.*, 578 F.3d at 1163 (noting that a "prominent apostrophe" was a "key distinguishing characteristic")). Notably, in 2011, Members 1st made a similar argument when defending against a cancellation proceeding brought by Cardwords, Inc. before the Trademark Trial and Appeal board. R. 30-7 ¶ 16 (arguing that the M1st Mark was not "nearly identical" to Cardworks, Inc.'s mark in part because "the Cardworks mark does not include a stylized depiction of a '1st'"). Further, M1 Holdings observes that the M1st Mark has (1) serifs, (2) variably weighted lines, (3) only a single break on the right side of the "M", (4) a large space separating the numeral "1," and is missing a semicircle and plus sign. Resp. at 12. Finally, M1 Holdings contends that the names evoked by the marks—"M1" and "M1st"—sound different and have separate meanings; the first relates to the financial

term used to describe a liquid form of money, and the latter indicates a position of importance. *Id.*

The Court finds the factor of similarity of the marks to be neutral. Certainly, the marks are somewhat similar. They share the prominent feature of combining an "M" letter with a numeral "1," and both create that distinction by inserting empty white space in the right up-stroke of the letter "M." And that is the most salient aspect of each mark. However, the thickness, serifs, and other break elements of the marks are dissimilar. Importantly, the presence of the "st" in the M1st Mark, and the difference in meaning that it evokes when compared with the M1 Marks, is significant. M1 simply does not carry the same meaning as M1st. Lastly, the prominent semicircle and plus sign present in the M1 Plus Mark make it quite dissimilar from the M1st Mark. Ultimately, the factor of similarity of marks does not weigh in favor of either party.

### 2. Similarity of Products and Services

When two companies sell a similar product or service, consumers are more likely to be confused. In assessing whether products are similar, the question is "whether the products are the kind the public attributes to a single source." *Ty,* 237 F.3d at 899–900 ("When considering whether products are closely related for the purpose of likelihood of confusion, '[a] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'") (citation omitted). "[A] plaintiff need not demonstrate that it is in direct competition

16

with an alleged infringer in order to establish likelihood of confusion." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988) (dog promoter was related to dog-toy seller because "it is entirely logical for a dog fancier to believe that a well-known kennel club . . . might sponsor . . . toy dogs representing" certain breeds).

Members 1st claims that the services offered by M1 Holdings and promoted under the M1 Marks are highly similar and overlapping with its own credit union services. Specifically, both businesses offer (1) investment services and (2) banking services like checking, credit, and debit card services—especially since M1 Holdings began partnering with Lincoln Savings. Memo. at 13–15. M1 Holdings counters by arguing that its mobile and web-based channels of commerce and target consumer base are different. Resp. at 13. However, that argument is more aptly characterized as an argument about the area and manner of concurrent use, addressed below. While Members 1st is a credit union and M1 Holdings is primarily a mobile and web-based financial services company, they offer overlapping financial products and services that the public might attribute to a single source. This factor weighs in favor of Members 1st.

### 3. Area and Manner of Concurrent Use

Likelihood of confusion increases if two businesses promote and sell their products and services in the same area and in the same way. "When considering the area and manner of concurrent use factor, we have to assess whether 'there is a relationship in use, promotion, distribution, or sales between the goods or services of

17

the parties.'" *Ty*, 237 F.3d at 900 (quoting *Forum Corp. of North America v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). Several factors can be important when determining whether the area and manner of concurrent use as between two marks is likely to cause confusion, including: (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the products; (3) whether the products are sold to consumers in the same type of store; and (4) whether the product is sold through the same marketing channels. *Id.*

Members 1st contends that both it and M1 Holdings promote their financial services nationally, using the "same channels of commerce" and targeting the "same general audience." *CAE*, 267 F.3d at 677. Members 1st asserts that its members include employees and organizations that "reside in nearly all 50 states." Reply at 16. It notes that consumers could open accounts with either Members 1st or M1 Holdings online or by phone.

M1 Holdings disputes that Members 1st promotes nationally, based on Members 1st's prior statements. Resp. at 13. For example, in a 2004 trademark application, Members 1st stated, "[B]y its charter, [Members 1st] is explicitly limited to providing services to its field of membership, presently consisting of people who live, work, worship, go to school, volunteer in [certain Pennsylvania counties]." R. 30-2 at 3. And in 2020, when attempting to obtain trademark protection for the word mark "MEMBERS 1ST," Members 1st said:

> Unlike in the case of a bank or mortgage company, whose services are generally open to the public, a credit union's services are, by definition, available only to its membership. . . . Credit unions' field of membership are limited to groups of people sharing "common bonds" . . . in the case

18

> of [Members 1st], a consumer can become a member of [Members 1st]
> only if his or her employer, organization, school or church is affiliated
> with [Members 1st] as a "Select Employer Group."

R. 30-9 at 8; *see also id.* at 37–38 ¶¶ 21, 26–28 (Members 1st says its field of
membership is limited to individuals or employers "located in Pennsylvania" and does
not extend to Iowa or New Hampshire because "[u]nlike banks and mortgage
companies, credit unions' services are not available to the general public").

The Court disagrees with M1 Holdings, which insinuates that Members 1st
can only do business with people located in Pennsylvania. Members 1st's past
statements do not go so far. Rather, those statements only show that Members 1st
limits its services to its *members*, and that Members 1st's members consisted, *at that
time*, only of individuals in certain states. R. 30-2 at 3 (describing its membership as
"*presently consisting* of people who live, work, worship, go to school, volunteer in
[certain Pennsylvania counties].") (emphasis added); *see* Memo. at 7 (Members 1st "is
open to anyone in the United States who falls within its field of membership"). M1
Holdings does not claim that a person living outside of Pennsylvania cannot open a
financial account with Members 1st or be a member in full standing of the credit
union. Indeed, Members 1st explicitly represents that its membership now includes
individuals and employers throughout the country. Reply at 16. In addition, even if
Members 1st's membership were limited to Pennsylvanians, there would still be
overlap because M1 Holdings appears to market its own products there. Memo. at 10
(discussing M1 Holdings' national ESPN commercial). Accordingly, the companies
share an overlapping geographic area and channels of commerce, and may be in direct

competition with one another in Pennsylvania or other states. This factor favors Members 1st.

### 4. Degree of Care Likely Exercised by Consumers

If consumers are likely to exercise great care when choosing between two products or services, there is less likelihood that the consumers will be confused. Members 1st nearly ignores this factor, essentially conceding that consumers of financial services take great care. Memo. at 13 n.5 ("With respect to the fourth factor, while consumers may be more careful in selecting a financial services provider, it does not mean that they would not be confused as to the affiliation between two financial companies whose brands both contain the text 'M1' as their primary component."); Reply at 16 (citing *Dynamic Model Prod., Inc. v. Circus Hobbies, Inc.*, 1990 WL 265987, at *3 (C.D. Ill. Apr. 11, 1990) ("While retailers are likely to exercise a higher degree of care than consumers, the similarity between the marks and the closely associated product lines may create confusion.")). M1 Holdings, for its part, cites to Members 1st's own prior statement to support the notion that financial customers exercise care when making decisions. Resp. at 5 (citing R. 30-2 at 3 (in 2004, Members 1st says "one would expect persons transacting financial business to pay careful attention to the identity of the financial institution")). The Court agrees that this factor strongly favors denial of an injunction. *First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*, 153 F.3d 885, 889–90 (8th Cir. 1998) (recognizing that "customers tend to exercise a relatively high degree of care in selecting banking services" and "other courts have determined there to be minimal or no likelihood of

confusion even where the names of financial institutions share the same dominant terms").

### 5. Strength of Members 1st's Mark

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 731 (7th Cir. 2015) (quoting *CAE,* 267 F.3d at 684). "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008) ("The strength of a mark usually corresponds to its economic and marketing strength.").

Members 1st characterizes its mark as "arbitrary as applied to its good and services," so it is inherently distinctive and strong. Memo. at 15. Through extensive 20-year advertising, it is widely and favorably known. *Id.* at 16 n.9 (citing 15 U.S.C. § 1115(b) for the proposition that an incontestable trademark is conclusively presumed to be inherently distinctive).

M1 Holdings again contends that Members 1st's prior statements contradict its argument. Specifically, in 2004, Members 1st argued that the similarity of names in the financial industry—where terms like "First" and "Federal" are common—"is far 'less remarkable' than it might be in other industries[.]" Resp. at 4 (citing R. 30-2 at 3). M1 Holdings also observes that many third-party financial institutions use "M1" marks similar to the M1st Mark, demonstrating its lack of distinctiveness. Resp.

at 15 (citing R. 1-4 at 3–4[3]; *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1003 (N.D. Ill. 1997) (extensive use of similar marks by third parties demonstrates lack of distinctiveness and strength)). In reply, Members 1st contends that M1 Holdings fails to establish that any of these third-party marks "are actually used, well-promoted, or recognized by consumers, thereby weakening [Members 1st's] mark." Reply at 17 n.23 (quoting *Chicago Trib. Co. v. Fox News Network, LLC*, 520 F. Supp. 2d 930, 938 (N.D. Ill. 2007)).

Members 1st fails to demonstrate that the M1st Mark is strong. It supports its claims about the economic strength of its mark only through the declaration of its General Counsel, submitting no other testimony, survey evidence, or data. *See* Memo. at 15–16 (citing Reimer Decl.). While the M1st Mark may have gained incontestable status and been widely advertised over twenty years, "[t]he status of a mark as incontestable does not *ipso facto* establish the relative strength of a mark in a likelihood of confusion analysis." *Am. Soc'y of Plumbing Engineers v. TMB Pub., Inc.*, 109 F. App'x 781, 788 (7th Cir. 2004) (citing 5 *McCarthy on Trademarks and Unfair Competition, supra,* § 32:155 ("Incontestable status does not make a weak mark strong.")). The Court therefore finds that this factor weighs in favor of denying the injunction.

---

[3]

| Logo | URL | Logo | URL | Logo | URL | Logo | URL |
|---|---|---|---|---|---|---|---|
| [N logo] | mainfirst-invest.com/en/ | [M1 logo] | www.linkedin.com/company/merrick-bank/ | | | | |
| [M logo] | rockthomas.com/m1/ | [NM M1 COMMERCE logo] | www.m1commerce.com/ | [M logo] | www.martiros.com/ | [M1 logo] | www.merkleinc.com/m1 |
| [M logo] | www.fnb-online.com/terms-of-use/trademarks | [Members First logo] | www.m1st.org/ | [M1st logo] | www.me1stcu.com/ | [M1 logo] | www.metro1.com/ |

### 6. Actual Confusion

While evidence of actual confusion is "entitled to substantial weight" in the analysis, Members 1st "need not show actual confusion in order to establish *likelihood* of confusion." *Unity Health Plans Ins. Co. v. Iowa Health Sys.*, 995 F. Supp. 2d 874, 893 (W.D. Wis. 2014) (citing *CAE*, 267 F.3d at 685 and *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992)). Here, Members 1st provides no evidence of actual confusion. Instead, it posits that confusion is still likely given the other factors, so this factor is "neutral at best." Reply at 17. However, "[e]vidence of actual confusion often takes the form of a consumer survey, but [Members 1st] has not conducted any such survey." *SFG, Inc. v. Musk*, 2019 WL 5085716, at *11 (N.D. Ill. Oct. 10, 2019); *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 590 (S.D.N.Y. 2015) (the absence of surveys is evidence that actual confusion cannot be shown). Further, any similarity between the two marks is a "separate consideration" from the actual confusion analysis. *Eli Lilly*, 233 F.3d at 465 ("[W]e are concerned here with evidence of *actual* confusion, not a mere risk of confusion, and we find no such evidence in the record. The similarity of the two marks is a separate consideration in our analysis, and although it does create a risk of confusion, it does not constitute evidence of actual confusion."). Accordingly, the Court finds that this factor weighs against issuing a preliminary injunction.

### 7. M1 Holdings' Intent to Palm Off Its Services as Those of Members 1st

This element examines bad faith intent on behalf of the accused infringer, focusing on "evidence that the defendant is attempting to pass off its product as

having come from the plaintiff." *Sorensen*, 792 F.3d at 731. If M1 Holdings intended to palm off its services as those of Members 1st, confusion is more likely. The intent that matters in the likelihood of confusion analysis is whether M1 Holdings chose the M1 Marks in order to cause confusion, and "not merely the intent to use a mark that is already in use somewhere else." *Meridian*, 128 F.3d at 1120. Intent to confuse may be inferred in some circumstances where the senior mark has attained significant notoriety. *Sands*, 978 F.2d at 963.

Members 1st first notes that "[i]t is the *second* user's responsibility to avoid confusion in its choice of a trademark, and that responsibility must include choosing a mark whose salient portion would not likely be confused with a first user's mark." Memo. at 16 (citing *F. Corp. of N. Am. v. F., Ltd.*, 903 F.2d 434, 440 (7th Cir. 1990)). It then argues that M1 Holdings' ill intent should be inferred from the similarity of the marks, given Members 1st's nationwide marketing of the M1st Mark in the decades prior to the M1 Marks' registration. Memo. at 16. It also points to M1 Holdings' partnership with Lincoln Savings and expansion into Members 1st's primary sphere of business—banking services—as evidence of M1 Holdings' ill intent. *Id.* at 16–17 (M1 Holdings' "intentions are clear—adopt a nearly identical trademark and provide overlapping services in order to trade off the goodwill, distinction, and reputation of Members 1st"). M1 Holdings responds that it is a national "purveyor of web-based and mobile digital financial goods," so the claim that it was "attempting to pass off its business as that of a Pennsylvania-centered credit union called Members 1st borders on the absurd." Resp. at 3.

Despite Members 1st's insistence, the Court is not convinced that this is "a case where [Members 1st's] trademark is so well-known that [M1 Holdings'] choice of a confusingly similar mark, out of the infinite number of marks in the world, itself supports an inference that [M1 Holdings] acted in bad faith." *Sands*, 978 F.2d at 963. There is no evidence that M1 Holdings knew about Members 1st as a company, let alone its mark, when it applied to register the M1 Marks. Indeed, Members 1st is just the 47th largest credit union in the country, with branches solely in Pennsylvania. Memo. at 2 (citing Reimer Decl. ¶¶ 4–6). Members 1st offers little circumstantial evidence of M1 Holdings' bad faith besides the alleged similarity of the marks. Neither does Members 1st provide objective evidence of its sound reputation. Finally, M1 Holdings supplies a reasonable, good-faith explanation for its intentional use of the term "M1"; that term is known in the industry as a measure of the money supply. Resp. at 16 (citing R. 30-16). The Court finds that this factor favors M1 Holdings.

The Court concludes that Members 1st has failed to meet its burden to establish a likelihood of success on the merits. While it has a protectible trademark, M1 Holdings' use of the M1 Marks is not likely to create confusion among consumers. The marks, while somewhat similar, are not so similar as to weigh in favor of an injunction. As financial investment and banking institutions, Members 1st and M1 Holdings sell similar products and services, and share a similar area and manner of use, promotion, and distribution. However, the M1st Mark is not particularly strong, financial consumers exercise a great deal of care when choosing among financial vendors, and there is little to no evidence of ill intent or actual confusion. Evaluating

25

the factors together, Members 1st has not met its burden to establish a likelihood of success on the merits, so the Court cannot issue a preliminary injunction.

Because Members 1st fails to meet the threshold requirement of likelihood of success on the merits, a preliminary injunction will not be issued, and the Court's inquiry may end. *Piekosz-Murphy*, 858 F. Supp. 2d at 961–62. Nevertheless, for the sake of completeness, the Court will address the parties' arguments regarding irreparable harm and adequate remedy at law.

## III.    Irreparable Harm and Adequate Remedy

Members 1st argues that it is entitled to a "rebuttable presumption of irreparable harm upon a finding . . . of likelihood of success on the merits[.]" Memo. at 17 (quoting 15 U.S.C. 1116(a)); *see Eli Lilly*, 233 F.3d at 469 ("Irreparable harm is generally presumed in cases of trademark infringement and dilution."); *Rosati v. Rosati*, 2021 WL 3666432, at *11 (N.D. Ill. Aug. 18, 2021) ("[O]ther courts in this District have concluded that the better course is to continue to apply *Eli Lilly*'s presumption of irreparable harm until the Seventh Circuit revisits the issue."). But as the Court has already held, Members 1st has not established a likelihood of success on the merits, so it is not entitled to the presumption. *See LigTel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792, 808–09 (N.D. Ind. 2020), *appeal dismissed,* 2020 WL 9813549 (7th Cir. Nov. 12, 2020) ("Traditionally, the Seventh Circuit has articulated a presumption of irreparable harm in Lanham Act cases. . . . More recently, however, the Supreme Court called this presumption into question [in *eBay*] when it rejected the categorical rule that a permanent injunction must issue

26

upon a showing of patent infringement. . . . [Because the Seventh Circuit has held that *eBay* governs a motion for a preliminary injunction in a copyright case], this Court declines to endorse a blanket presumption [of irreparable harm] and will look with a discerning eye to the facts presented by the parties.").

Members 1st contends it will suffer irreparable harm from the loss of goodwill and damage to its reputation. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*, 123 F. Supp. 2d 470, 479 (E.D. Wis. 2000) ("[T]he Seventh Circuit recognizes the loss of goodwill as an irreparable harm."). It also argues that it quickly contested M1 Holdings' use of the M1 Marks after learning about them, as would any company seeking to avoid irreparable harm, and filed this preliminary injunction soon after its good faith discussions failed, and M1 Holdings filed this lawsuit.

M1 Holdings disagrees, arguing that Members 1st delayed bringing this motion for seventeen months, undermining Members 1st's contention that it urgently sought to avoid irreparable harm. Resp. at 8; *see Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) (precluding a finding of irreparable harm due to unexplained eighteen-month delay).

M1 Holdings maintains that Members 1st "undoubtedly had notice by October 2020, when it sent M1 Holdings a letter referencing the M1 website and various uses of the Accused Marks." Resp. at 8 (alleging M1 Holdings had been using the M1 Mark for financial and investment services since 2016, and checking and debit card services since 2019). At the least, says M1 Holdings, a letter from Members 1st to M1 Holdings in August 2021 shows that Members 1st had knowledge at that time that M1

27

Holdings was providing banking services. Resp. at 9 (citing R. 30-13). In contrast, Members 1st claims that it first learned of M1 Holdings' expansion into banking services in November 2021. Reply at 10 (citing R. 31-15 at 3 (in 2021 declaration to USPTO, M1 Holdings says it used the M1 Marks for "[c]hecking account services . . . [a]t least as early as 01/31/2021")). Members 1st explains that the August 2021 correspondence it sent to M1 Holdings was a draft agreement that "listed no actual uses in banking." Reply at 11. And only in January 2022 did it learn that M1 Holdings was nationally broadcasting its banking services with the M1 Mark. *Id.*

The parties spill much ink arguing about precisely when Members 1st gained notice of M1 Holdings' alleged infringement, but whether Members 1st received notice of infringement in October 2020, or August or November 2021, is of no matter. Even accepting Members 1st's contention that it first received notice of infringement in November 2021 and therefore did not delay bringing this motion, it has failed to demonstrate that it will suffer irreparable harm without an injunction. Members 1st provides no evidence that it has or is likely to lose customers or revenue due to M1 Holdings' use of the M1 Marks. It claims it will suffer damage to its reputation and goodwill but provides no objective evidence of its own standing in the market, nor any evidence that M1 Holdings' reputation or quality is inferior such that confusion would negatively reflect on Members 1st. Therefore, Members 1st has failed to "demonstrate that [it] will *likely* suffer irreparable harm[.]" *LigTel*, 455 F. Supp. 3d at 809 (the hurdle requires "more than a mere possibility of harm" because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief") (citing *Winter*, 555 U.S. at 22).

The Court having found that Members 1st has failed to establish an inadequate remedy and irreparable harm, need not consider the balance of harms factor.

## Conclusion

For the foregoing reasons, M1 Holdings' motion for leave to file a sur-response [32] is granted and Members 1st's motion for preliminary injunction [13] is denied.

Dated: December 7, 2022

United States District Judge
Franklin U. Valderrama