**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| M1 HOLDINGS INC., | |
| Plaintiff, | |
| v. | Case No. 22-cv-01162 |
| MEMBERS 1ST FEDERAL CREDIT UNION, | Judge Jeffrey I. Cummings |
| Defendant. | Mag. Judge Jeffrey Cole |
| MEMBERS 1ST FEDERAL CREDIT UNION, | |
| Counter-Claimant, | |
| v. | **JURY TRIAL DEMANDED** |
| M1 HOLDINGS INC., LINCOLN SAVINGS BANK, and B2 BANK NATIONAL ASSOCIATION, | |
| Counter-Defendants. | |

**DEFENDANT/COUNTER-CLAIMANT MEMBERS 1ST FEDERAL CREDIT UNION'S**
**FIRST AMENDED COUNTERCLAIMS**

Defendant/Counter-Claimant Members 1st Federal Credit Union ("Members 1st"), by and through its undersigned counsel, hereby asserts the following Amended Counterclaims against Counter-Defendants M1 Holdings, Inc. ("M1 Holdings"), Lincoln Savings Bank ("Lincoln Savings"), and B2 Bank National Association ("B2 Bank") (collectively, "Counter-Defendants").

**NATURE OF THE ACTION**

1.       This is an action for trademark infringement, false designation of origin, unfair competition, and deceptive acts and practices in violation of the laws of the United States and the Commonwealth of Pennsylvania and the State of Illinois. Members 1st seeks entry of a preliminary and permanent injunction and an award of profits, damages, and other related relief.

**THE PARTIES**

2.      Members 1st is a federally chartered credit union having its principal place of business at 5000 Marketplace Way, Enola, Pennsylvania 17025.

3.      Upon information and belief, M1 Holdings is a Delaware corporation having its principal place of business at 200 N. LaSalle Street, Suite 800, Chicago, Illinois 60601.

4.      Upon information and belief, Lincoln Savings is a federally insured bank having its principal place of business at 360 Westfield Avenue, Suite 6, Waterloo, Iowa 50701.  According to its website, Lincoln Savings provides banking services to both individuals and businesses.

5.      Upon information and belief, B2 Bank, formerly known as First National Bank of Buhl Inc., is a federally insured bank having its principal place of business at 8355 Unity Drive, Mountain Iron, Minnesota 55768. According to its website, B2 Bank provides banking services to both individuals and businesses.

**JURISDICTION AND VENUE**

6.      Counter-Claimant's claims are predicated upon the Lanham Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.*, and related claims under the statutory and common laws of the Commonwealth of Pennsylvania and the State of Illinois.  This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a) and (b), and supplemental jurisdiction over the claims arising under the common laws of the Commonwealth of Pennsylvania and the State of Illinois pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

7.      This Court has personal jurisdiction over Counter-Defendant M1 Holdings by virtue of, among other things, it having consented to the jurisdiction of this Court by filing its Complaint.

8.      This Court has personal jurisdiction over Counter-Defendants Lincoln Savings and B2 Bank because, upon information and belief, (1) they have committed, and continue to commit, acts of infringement in the District and (2) they have purposefully directed their infringing conduct to the State of Illinois, including through their business dealings with M1 Holdings within the State of Illinois.

9.      Venue is proper under 28 U.S.C. §§ 1391 and 1400 because Counter-Defendants are subject to personal jurisdiction in the District and have committed acts of infringement in the District.

## GENERAL ALLEGATIONS

### MEMBERS 1ST's TRADEMARK

10.     Counter-Claimant Members 1st is a member-owned, full-service financial institution located in South Central Pennsylvania. Originally founded in 1950, Members 1st has operated under the name "Members 1st Federal Credit Union" since 1994.

11.     Originally, Members 1st was a single employer group credit union, but it expanded its membership to multiple employers and organizations in the early 1980s.

12.     Thereafter, membership in Members 1st became open to anyone in the United States who falls within its field of membership, today consisting of more than 11,000 employers and organizations. Family members of those individuals are also eligible for membership in Members 1st.

13.     Members 1st has 53 full-service branches and serves over 500,000 members, predominantly in Pennsylvania, although Members 1st has members living or working in all (or nearly all) 50 states, as well as in foreign countries.

14.     Based on total assets of over $6 billion as of December 31, 2021, Members 1st is ranked as the 47th largest credit union nationally and as the 3rd largest credit union in Pennsylvania.

15.     In or around March 2003, as part of a major corporate image marketing overhaul, Members 1st adopted and began using its new trademark, specifically, the M1st mark, which it uses in the following stylized format: **M**<sup>st</sup> ("M1st Mark").

16.     The **M**<sup>st</sup> logo was intended as an extension of its name "Members 1st" in that the M1st Mark consists primarily of a stylized letter "M," wherein the right-hand portion of the traditional "M" letter resembles a numeral "1."

17.     The M1st Mark was intended to distinguish Members 1st's services from those offered by its competitors, and to express Members 1st's simple but important philosophy of putting the needs of its members first.

18.     Members 1st is the owner of U.S. Trademark Registration No. 3055347, filed on February 18, 2005, and issued on January 31, 2006, on the Principal Register, for the trademark **M**<sup>st</sup> for credit union services.  Members 1st is also the owner of U.S. Trademark Registration No. 6349066, filed on September 11, 2019, and issued on May 11, 2021, on the Principal Register, for the trademark **M**<sup>st</sup> for charitable services.  The foregoing registrations are both valid and subsisting, in full force and effect.  Further, U.S. Trademark Registration No. 3055347 has become incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065.  Attached

as **Composite Exhibit 1** are true and correct copies of the registration certificates and maintenance records for Counter-Claimant's United States Trademark Registration Nos. 3055347 and 6349066.

19.    Since 2003, Members 1st has continuously promoted its brand and services using the M1st Mark on television, radio, billboards, email, print advertising, public relations, community sponsorships, giveaways, and the internet.

20.    Thousands of promotional pieces, print ads, billboards and the like prominently featuring Members 1st's M1st Mark have been displayed and/or distributed to potential and actual customers throughout Pennsylvania, surrounding states, and via direct mail to members living in more distant states or countries.

21.    The M1st Mark is prominently featured in all aspects of Members 1st's public dealings.

22.    The M1st Mark and the products and services offered thereunder have received significant unsolicited coverage in various forms of media and outlets.

23.    Members 1st's M1st Mark is distinctive to both the consuming public and Members 1st's trade.

24.    Members 1st has expended substantial time, money, and other resources in developing, marketing, advertising, and otherwise promoting its M1st Mark and products and services sold under the M1st Mark.

25.    As a result of Members 1st's extensive expenditures and efforts, the M1st Mark  is widely and favorably known not only in Pennsylvania and surrounding areas, but across the United States and internationally to the trade and purchasing public to exclusively identify the sole source of the products and services offered by Members 1st and to signify the high quality of the products

and services designated by the M1st Mark, having acquired incalculable distinction, reputation, and goodwill value belonging exclusively to Members 1st.

26.     As a result of its widespread, continuous, and exclusive use of the M1st Mark to identify its products and services, and Members 1st as their source, Members 1st owns and holds valid and subsisting federal statutory and common law rights to the M1st Mark.

27.     Members 1st has successfully policed, protected and enforced its M1st Mark against past infringements, including in, *inter alia*, *Members 1st Federal Credit Union v. Metro Bank et al.* (MDPA Case No. 1:09-cv-01171), *Members 1st Federal Credit Union v. Merrick Bank Corporation* (MDPA Case No. 1:11-cv-00630), and *Members 1st Federal Credit Union v. 206 Design, LLC et al.* (MDPA Case No. 1:22-cv-00225).

28.     Upon information and belief, none of Members 1st's competitors (apart from Counter-Defendants as described below) use Members 1st's M1st Mark in advertising competing financial products and services.

29.     For these reasons, Members 1st is diligently protective of its rights in the M1st Mark.

### COUNTER-DEFENDANTS M1 HOLDINGS' AND LINCOLN SAVINGS' UNLAWFUL ACTIVITIES

30.     Upon information and belief, Counter-Defendant M1 Holdings incorporated in or around 2015 (which dates over 12 years after Members 1st first began using its M1st Mark).

31.     On or around February 2016, M1 Holdings began providing a website at the domain name www.m1finance.com that advertised investment portfolio services offered primarily under the name "M1 FINANCE."

32.     About a year later, M1 Holdings updated its website to advertise its related mobile application also offered primarily under the name "M1 Finance."

33. On August 31, 2020, M1 Holdings filed U.S. Trademark Applications for the "M1: THE FINANCE SUPER APP" designation, namely, U.S. Trademark Application No.'s 90/149274, 90/149314, and 90/149301, were filed for use in connection with "a mobile application for brokerage and trading of investments . . ." (in international class 009); "Providing a website feature non-downloadable software for brokerage and trading of investments. . ." (in international class 042); and "financial and investment services . . ." (in international class 36), respectively.

34. In or around October 20, 2020, Members 1st learned of M1 Holdings' trademark application filings that incorporated the text "M1" for use in connection with the proposed financial products and services, and immediately sent it a cease-and-desist letter.

35. On October 29, 2020, M1 Holdings responded to Members 1st's cease-and-desist letter, arguing that "M1: THE FINANCE SUPER APP" is distinguishable from Members 1st's M1st Mark because of the additional words "THE FINANCE SUPER APP." M1 Holdings also argued that Members 1st's uses of the M1st Mark were not focused on investment services like those offered by M1 Holdings.

36. Based upon M1 Holdings response letter, Members 1st understood that M1 Holdings would primarily be offering its investment services under the M1: THE FINANCE SUPER APP mark (which was consistent with the domain name it used that included the "M1finance" text in it), in connection with its technology services, *i.e.*, providing a website and mobile application for investment services; and that M1 Holdings would not be offering banking services like those Members 1st provides, including, without limitation, checking, savings, debit and credit card, and personal loan services, to its customers.

**M1 HOLDINGS AND LINCOLN SAVINGS KNOWINGLY AND WILLFULLY CHANGE THE STATUS QUO**

37.     Notwithstanding the foregoing, on or about November 18, 2020, despite having actual knowledge of Members 1st, its 1st's registered M1st Mark and Members 1st's objection to M1 Holdings use of "M1" marks in connection with traditional banking services, M1 Holdings began an apparently planned expansion of the nature and manner of its trademarks that incorporated the text "M1" and the goods and services it offered thereunder, filing three new U.S. trademark applications seeking to register the  designation for use in connection with all of the following products and services:

> Providing a website featuring non-downloadable software for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Providing a website featuring non-downloadable software for providing information in the field of finance, securities trading, investments, and securities brokerages; Providing temporary use of a non-downloadable web application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Providing temporary use of a non-downloadable web application for providing information in the field of finance, securities trading, investments, and securities brokerages (in international class 42).

> Downloadable software in the nature of a mobile application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Downloadable software in the nature of a mobile application for providing information in the field of finance, securities trading, investments, and securities brokerages (in international class 009).

> Financial and investment services, namely, management and brokerage in the fields of stocks, bonds, options, commodities, futures and other securities, and the investment of funds of others; Financial information provided by electronic means in the field of stocks, bonds, options, commodities, futures and other securities, and the investment of funds of others; Financial investment brokerage services; Electronic financial trading services (in international class 036).

38.     Then, in May and July 2021, M1 Holdings proceeded to file the below U.S. trademark applications.  These applications were published for objection by third parties on March 1, 2022.

| Mark | Appl. # | Goods/Services |
|---|---|---|
|  | 90705960 | Downloadable software in the nature of a mobile application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Downloadable software in the nature of a mobile application for providing information in the field of finance, securities trading, investments, and securities brokerages; Downloadable software in the nature of a mobile application for accessing, viewing, and managing checking accounts (in international class 009). |
|  | 90705968 | Checking account services; Financial and investment services, namely, management and brokerage in the fields of stocks, bonds, options, commodities, futures and other securities, and the investment of funds of others; Financial information provided by electronic means in the field of stocks, bonds, options, commodities, futures and other securities, and the investment of funds of others; Financial investment brokerage services; Electronic financial trading services (in international class 036). |
|  | 90705978 | Providing a website featuring non-downloadable software for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Providing a website featuring non-downloadable software for providing information in the field of finance, securities trading, investments, and securities brokerages; Providing a website featuring non-downloadable software for accessing, viewing, and managing checking accounts; Providing temporary use of a non-downloadable web application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Providing temporary use of a non-downloadable web application for providing information in the field of finance, securities trading, investments, and securities brokerages; Providing temporary use of a non-downloadable web application for accessing, viewing, and managing checking accounts (in international class 042). |
|  | 90813234 | Credit card payment processing services; Credit card transaction processing services; Credit card transaction processing services provided via a mobile application or website; Debit card transaction processing services; Debit card transaction processing services provided via a mobile application or website; Payment processing services, namely, credit card and debit card transaction processing services (in international class 036). |

| Mark | Appl. # | Goods/Services |
|---|---|---|
|  | 90813247 | Magnetically encoded credit cards; Magnetically encoded debit cards (in international class 009). |

39.     In or around June 9, 2021, Members 1st learned of the first three additional trademark applications filed by M1 Holdings for the  design for various categories of products and services relating to investment services because the applications were published for objections by third parties.  Members 1st immediately filed an extension of time to oppose through its counsel and then settlement discussions began between Members 1st and M1 Holdings.  While discussions were ongoing, Members 1st believed that the parties were working in a good faith attempt to resolve the matter in a way that would avoid consumer confusion and, thus, that both parties would continue to maintain the status quo that had existed.

40.     On November 16, 2021, Members 1st filed a proceeding before the U.S. Trademark Trial and Appeal Board to oppose the registration of the above-discussed application (U.S. Trademark App. No. 90/326818), for the  mark for use with financial services in international class 036, based upon likelihood of confusion with Members 1st's registered and incontestable M1st Mark () for credit union services in international class 36.  That proceeding is pending.

41.     Then, further contrary to the status quo, in November 2021, M1 Holdings disclosed to Members 1st's counsel that M1 Holdings was actively offering not only a website and mobile application for investment services, but had expanded to offer banking services under the highly

similar designation **M** as well as variations thereof (including M1 and (M+) ) (collectively, the "<u>Infringing Marks</u>").

42.     M1 Holdings decided to expand its products and services into Members 1st's primary zone of business, namely banking and credit union services, despite having actual knowledge of Members 1st, its registered M1st Mark for use with credit services, and Members 1st's objection to M1 Holdings' use of the Infringing Marks, particularly, the use of the **M** designation, in connection with banking services.

43.     After learning of M1 Holdings' expansion into traditional banking services, Members 1st began further investigation of M1 Holdings' actual marketplace uses of the Infringing Marks and the products and services being offered thereunder, and the extent of the same.

44.     On January 17, 2022, Members 1st became aware that M1 Holdings used the Infringing Marks in a televised advertisement that was broadcast nationally to millions of viewers on the ESPN television network just prior to a Monday night NFL Wild Card Game, specifically, during the matchup between the Arizona Cardinals and the Los Angeles Rams.

45.     From further investigation in the subsequent weeks, Members 1st learned, including from the representations on the M1 Holdings and Lincoln Savings Bank's websites, that M1 Holdings had partnered with Lincoln Savings and that Lincoln Savings was offering banking services, including checking, debit, and credit card services, to M1 Holdings' customers, under the Infringing Marks.

46.     In accordance with that partnership, Lincoln Savings furnished checking accounts, and credit and debit cards to M1 Holdings' customers under the Infringing Marks.

47.     In the absence of its partnership with a bank, like Lincoln Savings, M1 Holdings could not offer customers traditional banking services, such as checking accounts and debit cards.

48.     Additionally, on or around February 3, 2022, M1 Holdings expanded the online advertising of its services from the website domain www.m1finance.com to redirect consumers to the website branded solely as "m1" at the domain name www.m1.com.

49.     Learning of the foregoing significant expansions of M1 Holdings' products and services offerings under the Infringing Marks, including through its partnership with Lincoln Savings, Members 1st immediately sent a letter to M1 Holdings, noting it was a final attempt to come to an amicable resolution without a further escalation of this matter for court intervention.

50.     In particular, on February 11, 2022, Members 1st sent cease-and-desist letters to both M1 Holdings and Lincoln Savings demanding that they immediately cease use of the designation and any other Infringing Marks in connection with services that are similar and/or identical to those of Members 1st.  *See* ECF No. 1-5.

51.     In response, on February 17, 2022, in what appears like merely an attempt to delay further action by Members 1st, M1 Holdings requested clarification regarding Members 1st's demand.  *See* ECF No. 1-6.

52.     On February 21, 2022, Lincoln Savings sent a similar letter requesting clarification of Members 1st's demand.

53.     On March 3, 2022, Members 1st sent clarification to both M1 Holdings and Lincoln Savings, providing specifics of its demands and urgently requesting a phone call with M1 Holdings to discuss the matter.  *See e.g.,* ECF No. 1-7.

54.     Neither Counter-Defendants M1 Holdings or Lincoln Savings provided a substantive response to Members 1st's March 3, 2022 letters.

55.     Instead, less than 24 hours after receiving the requested clarification and request for a discussion, M1 Holdings, in what appears to be an attempt at forum selection for the noticed and impending infringement claims, immediately commenced this declaratory judgment action against Members 1st.

56.     On June 12, 2023, more than a year after the filing of this lawsuit, Lincoln Savings represented to Members 1st that, as of May 19, 2023, M1 Holdings no longer permitted customers to open checking accounts furnished by Lincoln Savings or to receive M1 Visa® Debit Cards issued by Lincoln Savings.

57.     Despite this representation, M1 Holdings' m1.com website states that, while it is no longer opening new M1 Checking Accounts, existing M1 Checking Accounts would not be closed until **October 31, 2023**. A true and correct printout of an October 30, 2023 web capture of the M1st website is attached as **Exhibit 2**.

58.     Upon information and belief, Lincoln Savings continued to service existing M1 Checking Accounts until at least October 31, 2023. *Id.*

59.     Additionally, language currently included on M1 Holdings' m1.com website still states that M1 Checking Accounts and M1 Visa® Debit Cards are furnished by Lincoln Savings. *Id.*

**M1 HOLDINGS KNOWINGLY AND INTENTIONALLY FURTHER ENCROACHES ON MEMBERS 1ST'S ZONE OF BUSINESS WHEN ITS CEO AND FOUNDER BRIAN BARNES PERSONALLY PURCHASES B2 BANK TO PROVIDE M1 HOLDINGS CUSTOMERS WITH BANKING SERVICES UNDER THE INFRINGING MARKS**

60.     After Lincoln Savings represented to Members 1st that, as of May 19, 2023, M1 Holdings no longer permitted customers to open checking accounts furnished by Lincoln Savings or to receive M1 Visa® Debit Cards issued by Lincoln Savings, Members 1st learned that Brian

Barnes ("Barnes"), M1 Holdings' Founder and CEO, had personally purchased the First National Bank of Buhl, which he later renamed B2 Bank.

61.     Upon information and belief, Barnes purchased B2 Bank, despite possessing actual knowledge of Members 1st, its registered M1st Mark, and the likelihood of confusion between such use and M1 Holdings' use of the Infringing Marks in connection with Class 036 financial services (which knowledge he obtained no later than its receipt of the October 2020 cease-and-desist letter that Members 1st sent to his company M1 Holdings).

62.     Members 1st learned that Barnes wrote a blog post on M1 Holdings' website announcing he had purchased B2 Bank because "it signals both M1 [Holdings'] and my commitment **to incorporating banking products** into M1 [Holdings] to create a holistic personal finance platform." (emphasis added). A true and correct copy of the October 19, 2021 blog post is attached as **Exhibit 3**.

63.     Barnes further wrote: "Purchasing this bank provides M1 with another partner bank for its next banking product launch. While these companies are wholly separate, they intend to forge a partnership to change the future of finance." Ex. 3 at p. 2.

64.     Put simply, Barnes purchased B2 Bank with the express intention of forming a partnership between B2 Bank and his other company M1 Holdings that would enable M1 Holdings to continue to offer banking services to its customers under the Infringing Marks through B2 Bank instead of Lincoln Savings.

65.     Barnes wrote another blog post on M1 Holdings' website announcing that, in 2023, M1 Holdings intended to offer a high-yield savings account under the name "M1 High-Yield Savings Account." A true and correct copy of the November 14, 2022 blog post is attached as **Exhibit 4**.

66.     Barnes wrote that the M1 High-Yield Savings Account would be an FDIC-insured account offered by a partner bank—namely, his own bank, B2 Bank. Ex. 4.

67.     On May 9, 2023, M1 Holdings made a blog post on its website announcing the launch of the M1 High-Yield Savings Account.  A true and correct copy of the May 9, 2023 blog post is attached as **Exhibit 5**.

68.     In the post, M1 Holdings compared its M1 High-Yield Savings Account to similar products offered by traditional banking institutions like Chase Bank and Bank of America. Ex. 5.

69.     M1 Holdings further wrote the M1 High-Yield Savings Account offering is made possible by the partnership between M1 Holdings and B2 Bank. *Id.*

70.     The "Savings" webpage of M1 Holdings' website establishes that M1 Holdings is offering the M1 High-Yield Savings Account under one or more of the Infringing Marks.  A true and correct copy of the Savings webpage captured on August 1, 2023, is attached as **Exhibit 6**.

71.     On August 1, 2023, the Savings webpage stated that M1 Holdings is not a bank and that the M1 High-Yield Savings Accounts are furnished to M1 Holdings' customers by B2 Bank. Ex. 6.

72.     The Personal Loans webpage of M1 Holdings' website shows that M1 Holdings is also offering "M1 Personal Loans" under one or more of the Infringing Marks.  A true and correct copy of the Personal Loans webpage captured on August 1, 2023, is attached as **Exhibit 7**.

73.     On August 1, 2023, the Personal Loans webpage stated that M1 Holdings' M1 Personal Loans are also furnished to M1 Holdings' customers by B2 Bank. *Id.*

74.     Due to the partnership between M1 Holdings and B2 Bank, the parties are currently furnishing savings accounts and personal loans to M1 Holdings' customers under the  designation, as well as under the other Infringing Marks.

75. In the absence of its partnership with a bank, like B2 Bank, M1 Holdings could not offer customers traditional banking services, such as savings accounts and personal loans.

## LIKELIHOOD OF CONFUSION BETWEEN
## MEMBERS 1ST'S M1ST MARK AND THE INFRINGING MARKS

76. M1 Holdings' expansions of the nature and manner of uses of the designation and the other Infringing Marks, and the products and services offered under them—including as demonstrated by M1 Holdings' attempts to register the Infringing Marks—were all done with full, prior knowledge of Members 1st, Members 1st's financial services, and Members 1st's M1st Mark, in particular, its federally registered and incontestable mark.

77. Through October 31, 2023, M1 Holdings, through Lincoln Savings, had offered checking accounts to customers under the designation and the other Infringing Marks.

78. Counter-Defendants continue to offer debits cards, credit cards, savings accounts, personal loans, and other financial products and services to customers under the designation and the other Infringing Marks.

79. The Infringing Marks are highly similar, in fact nearly identical, in appearance to Members 1st's M1st Mark, in particular, the designation used by M1 Holdings as compared to Members 1st's federally registered and incontestable mark.

80. Further, the financial products and services M1 Holdings, Lincoln Savings, and B2 Bank offered and/or continue to offer under the Infringing Marks are identical, highly similar, and/or related to the products and services Members 1st offers.

81.     Additionally, the parties' respective goods and services target the same categories of individuals—namely, persons seeking investment and banking products and services—and travel in the same and/or related trade channels.

82.     Counter-Defendants' infringing acts have caused and are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of the Counter-Defendants' products and services and have and are likely to deceive the relevant consuming public into believing, mistakenly, that Counter-Defendants' products and services originate from, are associated or affiliated with, or are otherwise authorized by Counter-Claimant.

83.     Counter-Defendants' acts are willful with the intent to trade on the goodwill, distinction and reputation of Counter-Claimant's brand and M1st Mark, cause confusion and deception in the marketplace, and divert potential sales of Counter-Claimant's products and services to the Counter-Defendants.

84.     Counter-Defendants' acts are causing, and unless restrained, will continue to cause damage and irreparable harm to Counter-Claimant and to its valuable hard-earned reputation, distinction and goodwill with the consuming public for which Counter-Claimant has no adequate remedy at law.

85.     As a result of Counter-Defendants' infringing activities and unfair competition, Counter-Claimant has been damaged.

86.     Members 1st will lose sales to the extent that Counter-Defendants has caused or will cause consumers to obtain products and services from Counter-Defendants under the mistaken belief that they are obtaining them from Members 1st, or that there is a relationship between the parties when there is not.

87.     In addition, because it is currently unknown how extensively Counter-Defendants advertise and promote financial services and products under the Infringing Marks, Counter-Defendants are likely to unfairly gain recognition and sales at Members 1st's expense by benefiting from the reputation, goodwill and recognition already established and embodied in Members 1st's distinct M1st Mark.

88.     A further form of injury to Members 1st is the loss of control over its brand's reputation.  Counter-Defendants' unauthorized use of the Infringing Marks that are highly similar in appearance to Members 1st's M1st Mark causes Members 1st to be associated with services and products over which it has no control.

89.     This involuntary association could injure Member 1st if consumers are dissatisfied with Counter-Defendants' products and services for any reason and, consequently, have a less favorable opinion of Members 1st and its products and services.

90.     Counter-Claimant has retained the undersigned counsel and is obligated to pay it a reasonable fee in connection with this action.

## COUNTERCLAIM I
## FEDERAL TRADEMARK INFRINGEMENT
### (Against All Counter-Defendants)

91.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

92.     Counter-Claimant is the sole and exclusive owner of the federally-registered M1st Mark.

93.     The M1st Mark, as used by Counter-Claimant in connection with its products and services, is inherently distinctive and/or has acquired secondary meaning.

94.     Indeed, U.S. Trademark Registration No. 3055347 for the **M**<sup>st</sup> design mark is incontestable and, thus, it is conclusively presumed that such M1st Mark is inherently distinctive and/or has acquired secondary meaning under 15 U.S.C.A. § 1115(b).

95.     Counter-Defendants have used and are continuing to use the Infringing Marks in providing identical or substantially similar products and services to those offered by Counter-Claimant.

96.     Members 1st has not authorized, directly or indirectly, to Counter-Defendants use of the Infringing Marks in any manner.

97.     Counter-Defendants' activities complained of herein have been without Counter-Claimant's consent.

98.     Members 1st does not currently have the ability to control the nature and/or the quality of the goods and services Counter-Defendants offer under the Infringing Marks.

99.     Counter-Defendants' unauthorized use in commerce of the Infringing Marks as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Counter-Defendants' products and services, and is likely to cause consumers to believe, contrary to fact, that Counter-Defendants' products are sold, authorized, endorsed, or sponsored by Counter-Claimant, or that Counter-Defendants are in some way affiliated with or sponsored by Counter-Claimant.  Counter-Defendants' conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

100.    Counter-Defendants have committed the foregoing acts of infringement with full knowledge of Counter-Claimant's prior rights in the M1st Mark and with the willful intent to cause confusion and trade on Counter-Claimant's goodwill and reputation.

101.     Counter-Defendants' conduct is causing immediate and irreparable harm and injury to Counter-Claimant, and to its goodwill and reputation, and will continue to both damage Counter-Claimant and confuse the public unless enjoined by this Court.  Counter-Claimant has no adequate remedy at law.

102.     Counter-Claimant is entitled to, among other relief, injunctive relief and an award of actual damages, Counter-Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNTERCLAIM II
## FEDERAL FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
### (Against All Counter-Defendants)

103.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

104.     Counter-Defendants' unauthorized use in commerce of the Infringing Marks is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Counter-Defendants' products and services, and is likely to cause consumers to believe, contrary to fact, that Counter-Defendants' products are sold, authorized, endorsed, or sponsored by Counter-Claimant, or that Counter-Defendant is in some way affiliated with or sponsored by Counter-Claimant.

105.     Counter-Defendants' unauthorized use in commerce of the Infringing Marks constitutes use of a false designation of origin and misleading description and representation of fact.

106.     Upon information and belief, Counter-Defendants' conduct is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Counter-Defendant with Counter-Claimant.

107.     Counter-Defendants' conduct constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

108.     Counter-Defendants' conduct is causing immediate and irreparable harm and injury to Counter-Claimant, and to its goodwill and reputation, and will continue to both damage Counter-Claimant and confuse the public unless enjoined by this court. Counter-Claimant has no adequate remedy at law.

109.     Counter-Claimant is entitled to, among other relief, injunctive relief and an award of actual damages, Counter-Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNTERCLAIM III
## CONTRIBUTORY FEDERAL TRADEMARK INFRINGEMENT
### (Against B2 Bank)

110.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

111.     M1 Holdings' unauthorized use in commerce of the  designation, as well as the other Infringing Marks, is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of M1 Holdings' products and services, and is likely to cause consumers to believe, contrary to fact, that M1 Holdings' products are sold, authorized, endorsed, or sponsored by Members 1st, or that M1 Holdings is in some way affiliated with or sponsored by Members 1st.

112.     The above-described acts of M1 Holdings constitute direct trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

113.    B2 Bank had actual notice of the infringement described herein, namely that M1 Holdings' use of the  designation and variations thereof in connection with banking products and services was infringing on Members 1st's rights.

114.    B2 Bank has materially encouraged, enabled, induced or contributed to, and had the direct control and monitoring over the instrumentality, products and services used to, infringe Members 1st's rights. Among other things, B2 Bank has been providing, and continues to provide, banking services used by and provided by M1 Holdings to its customers.

115.    B2 Bank therefore bears contributory liability for M1 Holdings' infringement in violation of 15 U.S.C. § 1051, *et seq.* and the common law.

116.    B2 Bank has unfairly profited from the actions alleged.

117.    B2 Bank's conduct is causing immediate and irreparable harm and injury to Members 1st, and to its goodwill and reputation, and will continue to both damage Members 1st and confuse the public unless enjoined by this Court. Members 1st has no adequate remedy at law.

118.    Members 1st is entitled to, among other relief, injunctive relief and an award of actual damages, B2 Bank's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNTERCLAIM IV
## CONTRIBUTORY FEDERAL FALSE DESIGNATION OF ORIGIN
## AND UNFAIR COMPETITION
### (Against B2 Bank)

119.    Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

120. M1 Holdings' unauthorized use in commerce of the ⓜ designation, as well as the other Infringing Marks, is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of M1 Holdings' products and services, and is likely to cause consumers to believe, contrary to fact, that M1 Holdings' products are sold, authorized, endorsed, or sponsored by Members 1st, or that M1 Holdings is in some way affiliated with or sponsored by Members 1st.

121. The above-described acts of M1 Holdings constitute unfair competition and false designation of origin, and use of a false designation of origin and misleading description and representation of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

122. B2 Bank had actual notice of the infringement described herein, namely that M1 Holdings' use of the ⓜ designation and variations thereof in connection with banking products and services was infringing on Members 1st's rights.

123. B2 Bank has materially encouraged, enabled, or contributed to, and had the direct control and monitoring over the instrumentality used to, infringe Members 1st's rights. Among other things, B2 Bank has been providing, and continues to provide, banking services used by and provided by M1 Holdings to its customers.

124. B2 Bank therefore bears contributory liability for M1 Holdings' infringement in violation of 15 U.S.C. § 1051, *et seq.* and the common law.

125. B2 Bank has unfairly profited from the actions alleged.

126. B2 Bank's conduct is causing immediate and irreparable harm and injury to Members 1st, and to its goodwill and reputation, and will continue to both damage Members 1st and confuse the public unless enjoined by this court. Members 1st has no adequate remedy at law.

127.     Members 1st is entitled to, among other relief, injunctive relief and an award of actual damages, B2 Bank's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNTERCLAIM V
## <u>COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION</u>
### (Against All Counter-Defendants)

128.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in Counterclaims as if fully set forth in this paragraph.

129.     The aforementioned acts of Counter-Defendants constitute trademark infringement and unfair competition in violation of the common law of the Commonwealth of Pennsylvania.

130.     Such conduct on the part of Counter-Defendants has allowed Counter-Defendants to wrongfully profit and has injured Counter-Claimant in an amount to be determined at trial and has caused and threatens to cause irreparable injury to Counter-Claimant, for which Counter-Claimant has no adequate remedy at law.

131.     Counter-Defendants' actions as set forth above permit recovery of Counter-Defendants' profits, damages, and costs by Counter-Plaintiff, including treble damages and Counter-Claimant's attorney's fees.

132.     Counter-Defendants' conduct was malicious and wanton and Counter-Claimant is entitled to an award of punitive damages under Pennsylvania law.

## COUNTERCLAIM VI
## <u>ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS 510/2</u>
### (Against All Counter-Defendants)

133.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

134.    Counter-Defendants have been misleading consumers and are causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval of their products and services, and is otherwise damaging the public. Counter-Defendants' conduct constitutes unfair and deceptive acts or practices in the course of a business, trade, or commerce in violation of the under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

135.    Counter-Defendants' conduct has caused and is likely to continue to cause substantial injury to the public and to Counter-Claimant, entitling Counter-Claimant to injunctive relief and to recover damages, its costs and its reasonable attorney's fees.

136.    Counter-Defendants' actions as described above constitute trademark infringement and unfair competition in violation of Members 1st's rights under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

137.    Counter-Defendants' acts of infringement and unfair competition have been willful and deliberate.

138.    Counter-Claimant is entitled to, among other things, injunctive relief and an award of attorneys' fees and costs of the action under 815 ILCS 510/3.

**COUNTERCLAIM VII – CANCELLATION OF**
**U.S. TRADEMARK REGISTRATION NO. 6448395, 15 U.S.C. §§ 1052(d), 1064(1), 1119**
**(Against Counter-Defendant M1 Holdings Inc.)**

139.    Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

140.    Counter-Defendant M1 Holdings applied for and obtained U.S. Trademark Registration No. 6448395 for the mark , which issued on August 10, 2021, for use with the following services in international class 042:

> Providing a website featuring non-downloadable software for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities,

and equities; Providing a website featuring non-downloadable software for providing information in the field of finance, securities trading, investments, and securities brokerages; Providing temporary use of a non-downloadable web application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Providing temporary use of a non-downloadable web application for providing information in the field of finance, securities trading, investments, and securities brokerages.

141.    Counter-Claimant owns U.S. Trademark Registration No. 3055347, which issued on January 31, 2006, for the $M^{st}$ trademark for use with credit union services.

142.    Counter-Claimant is also the owner of U.S. Trademark Registration No. 6349066, which issued on May 11, 2021, for the $M^{st}$ trademark for use with charitable services.

143.    Counter-Claimant's registrations are valid and subsisting, and in full force and effect.

144.    Further, Counter-Claimant's U.S. Trademark Registration No. 3055347 for the $M^{st}$ trademark is incontestable.

145.    Counter-Claimant has used its registered and incontestable $M^{st}$ mark continuously and exclusively in connection with its products and services.

146.    The $M$ mark in Registration No. 6448395 is highly similar and/or nearly identical in appearance, sound, connotation, and commercial impression to Counter-Claimant's registered and incontestable $M^{st}$ mark.

147.    Further, the products and services recited in Registration No. 6448395 are highly similar and/or nearly identical to the credit union services recited in Members 1st's registrations.

148.    Additionally, the parties' respective products and services target the same classes of consumers and travel in the same or closely related trade channels.

149.     Counter-Claimant has not consented, directly or indirectly, to M1 Holdings' use in commerce of the ▥ mark in connection with the products and services recited in Registration No. 6448395.

150.     M1 Holdings' unauthorized use of the ▥ mark in commerce in connection with the services recited in the Registration No. 6448395, is likely to confuse, cause mistake, or to deceive consumers as to the origin, source, sponsorship, or affiliation of M1 Holdings' products and services, and is likely to cause consumers to believe, contrary to fact, that M1 Holdings' services are sold, authorized, endorsed, offered, or sponsored by Members 1st, or that M1 Holdings' products and services are, in some way, affiliated with Counter-Claimant.

151.     Registration No. 6448395 is less than one year old and is vulnerable to cancellation on likelihood of confusion grounds.

152.     Based on the above, the Court should cancel U.S. Trademark Registration No. 6448395 for the ▥ mark, pursuant to 15 U.S.C. §§ 1052(d), 1064(1), and 1119, based on a likelihood of confusion with Members 1st's earlier registered and incontestable $M^{st}$ mark.

## COUNTERCLAIM VIII – CANCELLATION OF
## U.S. TRADEMARK REGISTRATION NO. 6461513, 15 U.S.C. §§ 1064(1), 1119
### (Against Counter-Defendant M1 Holdings Inc.)

153.     Counter-Claimant adopts, repeats and realleges each and every allegation previously set forth in paragraphs 1-90 in these Counterclaims as if fully set forth in this paragraph.

154.     Counter-Defendant M1 Holdings applied for and obtained U.S. Trademark Registration No. 6461513 for the mark ▥, which issued to M1 Holdings on August 24, 2021, for use with the following goods in international class 009:

"Downloadable software in the nature of a mobile application for brokerage and trading of investments, securities, stocks, bonds, capital investments, commodities, and equities; Downloadable software in the nature of a mobile application for providing information in the field of finance, securities trading, investments, and securities brokerage."

155.    Counter-Claimant owns U.S. Trademark Registration No. 3055347, which issued on January 31, 2006, for the $M^{st}$ trademark for use with credit union services.

156.    Counter-Claimant is also the owner of U.S. Trademark Registration No. 6349066, which issued on May 11, 2021, for the $M^{st}$ trademark for use with charitable services.

157.    Counter-Claimant's registrations are valid and subsisting, and in full force and effect.

158.    Further, Counter-Claimant's U.S. Trademark Registration No. 3055347 for the $M^{st}$ trademark is incontestable.

159.    Since at least as early as March 1, 2003, Counter-Claimant has used its registered and incontestable $M^{st}$ mark continuously and exclusively in connection with its products and services.

160.    The $M$ mark in Registration No. 6461513 is highly similar and/or nearly identical in appearance, sound, connotation, and commercial impression to Counter-Claimant's registered and incontestable $M^{st}$ mark.

161.    Further, the products and services recited in Registration No. 6461513 are highly similar and/or nearly identical to the credit union services recited in Members 1st's registrations.

162.    Additionally, the parties' respective products and services target the same classes of consumers and travel in the same or closely related trade channels.

28

163. Counter-Claimant has not consented, directly or indirectly, to M1 Holdings' use in commerce of the **M** mark in connection with the products and services recited in Registration No. 6461513.

164. M1 Holdings' unauthorized use of the **M** mark in commerce in connection with products recited in the Registration No. 6461513, is likely to confuse, cause mistake, or to deceive consumers as to the origin, source, sponsorship, or affiliation of M1 Holdings' products s, and is likely to cause consumers to believe, contrary to fact, that M1 Holdings' products are sold, authorized, endorsed, offered, or sponsored by Members 1st, or that M1 Holdings' products are, in some way, affiliated with Counter-Claimant.

165. Registration No. 6461513 is less than one year old and is vulnerable to cancellation on likelihood of confusion grounds.

166. Based on the above, the Court should cancel U.S. Trademark Registration No. 6461513 for the **M** mark, pursuant to 15 U.S.C. §§ 1052(d), 1064(1), and 1119, based on a likelihood of confusion with Members 1st's earlier registered and incontestable **M**$^{st}$ mark.

**WHEREFORE**, Counter-Claimant Members 1st Federal Credit Union, demands judgment against Counter-Defendants M1 Holdings, Inc., Lincoln Savings Bank, and B2 Bank, as follows:

A. Finding that Counter-Defendants' activities complained of herein are unlawful under Federal, Pennsylvania and Illinois law;

B. Preliminarily and permanently enjoining Counter-Defendants, their predecessors, successors, assigns, divisions, subsidiaries, and joint ventures thereof, together with

any and all parent or affiliated companies or corporations, and all officers, directors, employees, agents, attorneys, representatives, and those acting in privity or concert with them, or on their behalf, from using the  designation, or any confusing similar variations thereof, including

M1, , and any marks comprised of or including the text "M1" regardless of stylization and design, and any marks confusingly similar to the M1st Mark, in connection with financial products and services;

      C.      Granting such other and further relief as the Court may deem proper to prevent the public and trade from deriving the false impression that any products or services manufactured, sold, distributed, supplied, licensed, marketed, advertised, promoted, or otherwise offered or circulated by Counter-Defendants are in any way approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Counter-Claimant or constitute or are connected with Counter-Claimant's products or services;

      D.      Directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), Counter-Defendants to file with the court and serve upon Counter-Claimant counsel within thirty (30) days after service on Counter-Defendants of an injunction in this action, or such extended period as the court may direct, a report in writing under oath, setting forth in detail the manner and form in which Counter-Defendants have complied therewith;

      E.      Awarding Counter-Claimant an amount up to three times the amount of its actual damages, in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a));

      F.      Directing that Counter-Defendants account to and pay over to Counter-Claimant all profits realized by its wrongful acts in accordance with Section 35(a) of the Lanham

Act (15 U.S.C. § 1117(a)), enhanced as appropriate to compensate Counter-Claimant for the damages caused thereby;

G.      Awarding Counter-Claimant punitive and exemplary damages as the Court finds appropriate to deter any future willful infringement;

H.      Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding Counter-Claimant its costs and reasonable attorneys' fees thereunder (15 U.S.C. § 1117(a));

I.      Awarding Counter-Claimant interest, including prejudgment and post-judgment interest, on the foregoing sums;

J.      Awarding such other and further relief as the Court deems just and proper;

K.      Ordering that U.S. Trademark Registration No. 6448395 is cancelled on grounds of likelihood of confusion;

L.      Ordering that U.S. Trademark Registration No. 6461513 is cancelled on grounds of likelihood of confusion; and

M.      Awarding such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Members 1st demands a trial by jury as to all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: November 2, 2023          Respectfully submitted,

**FOX ROTHSCHILD LLP**

*/s/ Melissa E. Scott*
Patricia M. Flanagan (*pro hac vice*)
Adam Wolek
777 South Flagler Drive
Suite 1700, West Tower
West Palm Beach, FL 33401
Telephone: (561) 835-9600
Facsimile: (561) 835-9602
Email: pflanagan@foxrothschild.com
Email: awolek@foxrothschild.com

Melissa E. Scott (*pro hac vice*)
747 Constitution Drive, Suite 100
Exton, PA 19341
Telephone: (610) 458-1413
Facsimile: (610) 458-7337
Email: mscott@foxrothschild.com

*Attorneys for Defendant/Counter-Claimant*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on November 2, 2023, I caused a true and correct copy of the foregoing

FIRST AMENDED COUNTERCLAIMS to be served on the following counsel of record via the

Court's electronic filing service, which service constitutes acceptable service under the Federal

Rules of Civil Procedure and the Court's Local Rules:

**Douglas Albritton**
**Peter Hawkins**
**Stacy Baim**
**Actuate Law, LLC**
**641 West Lake, 5th Floor**
**Chicago, IL 60661**
**Email: Doug.albritton@actuatelaw.com**
**Email: peter.hawkins@actuatelaw.com**
**Email: stacy.baim@actuatelaw.com**

***Attorneys for Plaintiff/Counter-Defendant***
***M1 Holdings Inc. and Counter-Defendant Lincoln Savings Bank***


Dated: November 2, 2023                                    */s/ Melissa E. Scott*
                                                          Melissa E. Scott