IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| M1 HOLDINGS, INC., ) | |
| ) | |
| Plaintiff, ) | No. 22 C 1162 |
| ) | |
| v. ) | Magistrate Judge Jeffrey Cole |
| ) | |
| MEMBERS 1st FEDERAL CREDIT ) | |
| UNION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

M1 Holdings has filed a motion to compel five categories of documents from Members 1st. For the following reasons, the motion [Dkt. #70] is denied in part and granted in part.

This is a trademark case about two marks: M1 Holding's "M1" logo and Members 1st's "M1st" logo. [Dkt. ##1-1, 1-2]. It would not be surprising for a layperson – who might be a customer – to say neither mark makes much of an impression, nor are they terribly distinctive. Much more importantly, however, Judge Valderrama has ruled that the M1st mark is not a strong one, and M1 Holdings ("M1") has pointed out that there are any number of third parties using marks similar to M1 or M1st. [Dkt. #34, at 21-22]. After all, the marks are merely combinations of one letter and one number, nominal or ordinal. So it is perhaps a bit surprising that Members 1st ("M1st") has produced thousands and thousands of pages of documents in the five categories of documents M1's motion is about – and continues to produce documents – but M1 thinks there must be more documents, wants – or wanted – them faster. Moreover, M1 is pretty heated about it, going so far as to accuse M1st's lawyers of lying when they repeatedly say that they produced "all the documents

they had located to date" [Dkt. #74, at 3 (" . . . produced all the documents … it has been able to locate to date…."), at 4 ("all the documents it has received to date from those efforts"), at 5 (". . . all agreements it has located to date for which it has been able to obtain the third parties' consent. Its efforts to obtain consent from other third parties continues."), at 12 (". . . produced all responsive, non-privileged documents it has been able to locate to date…." and "Members 1st has produced all responsive, non-privileged documents it has been able to locate to date after a reasonable search…."), at 13 ("produced all brand guidelines, branding policies, and brand style guidelines it has been able to locate to date after a reasonable search"), especially when M1st produces more documents after saying that. But isn't that what "to date" means? And do not parties have an obligation to supplement their document production when necessary? In any event, M1 has filed three briefs which, with exhibits, totaling about 330 pages, [Dkt. ##71, 76-84, 87,101], all about what seems to be a rather routine discovery matter in what should be a fairly simple case about two fairly simple marks.

Discovery has been going on for just about a year. On October 3, 2023, the discovery deadline was extended at the parties' behest for a third time, from December 3, 2023 to March 4, 2024. [Dkt. ##68, 69]. The parties said they had "served several sets of written discovery and document productions on one another, and continue to proceed with discovery on the claims they assert against one another." [Dkt. #68]. Discovery began almost a year ago, back in January 2023. [Dkt. #40]. There previously had been a sixty-day extension on August 2, 2023 [Dkt. ##52, 54], and a sixty-day extension on May 26, 2023 [Dkt. ##48, 49], so it is not as though the parties were proceeding at a breakneck pace and meeting the deadlines *they* selected. All along, as far as they told the court, the parties were producing documents on a rolling basis and supplementing their

production as they went [Dkt. ##42, 47, 50, 51, 57], with both sides producing documents well after the default thirty-day deadlines for their production had expired. Fed.R.Civ.P. 34(b)(2); *Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 200 (1999).

At some point, though, M1 tired of rolling production and flipped that script. The parties had conferences over their differences in April 2023, July 2023, and October 2023. Along the way, M1st was providing discovery responses and revised and supplemented those responses. For example, it produced 5,000 pages of documents on October 6th. But, it was still a trickle from M1's perspective. M1st promised to provide more documents the week of October 9th.[1] When Friday the 13th came and there was nothing from M1st by the middle of the day, M1 decided enough was enough and filed their motion to compel. Nevertheless, M1st continued with its rolling production and produced another 4,985 pages of documents on October 18, 2023, and another 3,078 pages of documents on October 19, 2023. [Dkt. #374, at 10].

On November 17, 2023, about three weeks after the motion was fully briefed and the court had begun sifting through the submissions, M1st produced another 2,000 pages of documents, and they were responsive to many of the requests from M1 that had been pending for months and that M1 had complained about in their motion to compel and reply. [Dkt. #101, at 1]. Coincidentally, on November 27, 2023, *M1* made a supplemental production of 1,692 new documents covering 5,533 pages, all of which were responsive to discovery requests that M1st served many months ago. That's typical of so-called rolling productions, with both parties continuing to produce documents

---

[1] Curiously, M1st complains that M1 set a "unilateral deadline of October 6, 2023 for production ...." [Dkt. #74, at 3]. That's a complete mischaracterization of these proceedings. The deadline for production of documents is set by Fed.R.Civ.P. 34(b)(2) and it is 30 days after the request is served. *Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 200 (1999). M1st missed that deadline by months.

as they find them. But, M1st's production was a trigger for M1. They filed a supplemental brief about it, saying, essentially, "you see? M1st was lying about having produced all the responsive documents they had." [Dkt. #101].

Sort of, but not really. Recall that M1st kept saying it "had produced all responsive documents it has been able to locate to date after a reasonable search"? Well, when M1st would then produce more documents thereafter, M1 took that as demonstrating M1st had not actually done a reasonable search. After all, if you find more documents after you claim to have done your best, then you hadn't really done your best, had you? So, the disconnect between "we sent you everything we can find" and "here's some more stuff we found" seems to be what this five-brief, four-hundred-page pages [Dkt. ##71, 74, 76-84, 87, 101, 103] squabble is all about.

Frankly, it's all a bit much and, to borrow from Fed.R.Civ.P. 26(b)(1), it's all a bit out of proportion to the needs of the case, considering the issues at stake. When parties to a discovery battle get to the point of having filed five briefs, the back-and-forth, we-said-they-said becomes confusing but, because M1 and M1st can't seem to agree on what a rolling production is, the court will have to attempt to sort their rather confusing and contradictory tales. As already noted, M1 breaks its motion down into five categories of documents, which seem to be, to a fair degree, somewhat peripheral to what one might think should be the heart of a trademark case. Nevertheless, the rulings for each category are as follows:

4

**Category 1: Merit Marketing Materials**[2]

As with all these categories, M1st insists it has produced all responsive, non-privileged documents – about 265 – "that it has located to date after a reasonable search." [Dkt. #74, at 12]. M1 doesn't believe M1st and really doesn't like the M1st qualification, "located to date." [Dkt. #76, at 3]. No documents responsive to this category were part of the November 17th production, so perhaps M1st's allegations are accurate. And, M1st did hedge its bets by saying "to date." M1st's "to date," cannot and should not be interpreted to mean that M1st will comply with its statutory obligation to continue its search and properly supplement its responses *as required by Rule 26(e)*. *See* Fed.R.Civ.P. 26(e)(1) (requiring a party to supplement or correct a prior incomplete or incorrect response in a timely manner).

As often happens with motions to compel, the parties present moving targets for the court. Production continued in this category, as M1st said it would, as M1 was filing its brief and the court was entering a briefing schedule and the briefing was completed. Has M1st has moved lethargically? Yes, but that's perhaps just a product of the parties' agreement to do rolling productions.

M1's biggest complaint in this category is that M1st's production is "almost devoid" of emails between M1st and Merit marketing. We are not told exactly what that means, only that M1st produced five MS Outlook files along with printouts of emails. [Dkt. #76, at 3]. How many emails are in those five files? M1 doesn't say, but they are upset that there aren't a lot of them from 2017 and 2018 when Merit was working on the M1st logo. [Dkt. #76, at 47; #101, at 3]. M1st doesn't quite say either, but seems to suggest there were 256 of them. That might be a lot, or it might be a

---

[2] Merit Marketing was engaged by M1st back in 2017 to do some "rebranding"; tweaking the M1st logo, apparently.

little. How many emails should there be between a Pennsylvania credit union and a Harrisburg marketing firm discussing how to position an "M" and a "1st" in the credit union's logo? Both sides are vague, perhaps deliberately so.

For M1, those kinds of emails are claimed to be "highly relevant" because, it says, they might discuss logos "in a manner that highlights differences in appearance when compared with features of each other and the accused marks." [Dkt. #71, at 8]. M1 contends that this goes to the issue of similarity of marks in appearance and suggestion, citing *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). [Dkt. #71, at 8]. It might, a little, but what's truly relevant is whether the *customer* would likely associate the product or service with which the mark is connected with the source of products or services with which an earlier mark is connected. *Sorensen*, 792 F.3d at 726 (citations omitted). *See also Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 425–26 (7th Cir. 2019)(". . . marks are troublingly similar if a *consumer* viewing one party's mark would likely associate the product with the other party's product." (emphasis added)); *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008)("The court should therefore 'consider whether the *customer* would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product.'" (emphasis added)); *see also* [Dkt. #34, at 14-16]. Thoughts from M1st and Merit while tweaking their logos might be worth something, but to say they are "highly relevant" is, at the very least, a bit of an exaggeration and not fairly descriptive. If such thoughts and discussions were highly relevant, M1 would have surely cited a case or two saying so. But, they have not. Indeed, M1's motion to compel is "almost devoid" of any pertinent authority to support its arguments. But that omission is as indicative of the lack of merit of the motion as it is fatal. *See, e.g., Reardon v. Danley*, 74 F.4th 825, 829 (7th Cir. 2023)("failure to provide any authority to support" an argument "dooms [a] claim.");

*Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that ... lack supporting authority are waived.").

So, as is often the case in discovery disputes, neither side gives the court much of anything concrete to go on. But, M1 says it wants M1st to provide a sworn statement that, after a search of its hard copy and digital records (including email), M1st has produced all documents in Category 1 in its possession, custody, or control. [Dkt. #76, at 5]. While "[o]rdinarily the representation of the responding party's attorney that no additional documents exist is sufficient to defeat a motion to compel absent credible evidence that the representation is inaccurate," *Snyder v. Fleetwood RV, Inc.*, No. 2:13-cv-1019, 2016 WL 339972, at *6 (S.D. Ohio Jan. 28, 2016), courts do order such Declarations once in a while. *See, e.g., Gibbs v. ABT Electronics, Inc.*, No. 21 C 6277, 2023 WL 6809610, at *12 (N.D. Ill. Oct. 16, 2023); *Luxottica Grp. S.p.A. v. Yiwu Cujia Trade Co.*, No. 22 CV 1140, 2023 WL 6520213, at *2 (N.D. Ill. Oct. 5, 2023); *Hansen v. Country Mut. Ins. Co.*, No. 18 CV 244, 2020 WL 5763588, at *3 (N.D. Ill. Sept. 28, 2020). Here, I am not entirely convinced in M1's position in terms of degree of relevance and proportionality with the importance of the issues in this case. But, as courts throughout the Nation have repeatedly recognized, people do tend to send a lot of emails. *See, e.g., LLC v. Capital Premium Finance, Inc.*, 2018 WL 1616725, *10 (N.D.Ill. 2018)(citing authority). This case seems to be one of those "once in a whiles." M1st will complete production in this category and either provide a sworn statement that it has produced all documents in this category or that it is holding back documents and why no later than February 28, 2024.

**Category 2: Brand Guidelines**

This category includes documents that might have been created up to a decade ago. Again, M1st says it has produced all brand guidelines, branding policies, and brand style guidelines that it

7

has been able to locate to date after a reasonable search. M1 concedes that it overreacted regarding documents in this category and "confirms that M1st appears to have made a good faith effort to produce responsive documents in Category 2." [Dkt. #76, at 6]. Nevertheless, it still wants the court to order M1st to provide a sworn declaration as to *this* category.

**Category 3: Agreements with Third Parties Regarding Use of the Mark**

M1st says it has "already produced agreements between itself and Merit Marketing and itself and LPL, including, without limitation, [twenty-one documents]." [Dkt. #74, at 13]. And it adds that it has encountered some delays producing agreements with other third parties "due to confidentiality provisions requiring the third parties' prior written consent for disclosure." [Dkt. #74, at 9].[3] As noted earlier, since the motion to compel has been briefed, M1st has continued to produce documents in this category, producing two or three dozen more agreements. [Dkt. #99-1, at 10-12]. The underlying requests are relevant and have been in play *for months*. Of the twenty-one documents originally produced, only eight were agreements and of those, six are with Merit and LPL. Production on this category has dragged on for a long time and, obviously, materials continue to trickle in. But, we are not given a date for completion except we are told it will be fairly soon. And that is manifestly insufficient by any fair measure. Fact discovery in this case is scheduled to end on March 4, 2024. M1st shall produce *all* agreements with third parties regarding use of the mark by February 28, 2024. If, at that time, there are still nagging issues with confidentiality – and there should not be – M1st shall provide a sworn declaration as to which third parties remain circumspect about producing what would seem to be run-of-the-mill contracts and their efforts with each of those

---

[3] And, M1st takes the opportunity to take a shot at M1, accusing them of being blasé about confidentiality. [Dkt. #74, at 9]. It's probably to be expected when the other side wants you to swear you're not lying.

parties.

**Category 4: 2003 Charter Amendments**

M1 concedes that M1st has produced its original 1950 charter, and amendments from 2003 and 2008. M1 thinks, or speculates, that there were more amendments after 2008. [Dkt. #76, at 7-8]. M1st said it has already produced all responsive, non-privileged documents that it has been able to locate after a reasonable search. [Dkt. #74, at 13-14]. (Since the motion to compel has been fully briefed, M1st has apparently produced additional documents relating to amendments to their bylaws. [Dkt. #99-1, at 11]). M1 contends that amendments to the charter are "highly relevant . . . as they aid in defining [M1st's] relevant target customers and channels of trade, both of which are key elements to the likelihood of confusion analysis." [Dkt. #71, at 12-13]. The court isn't so sure statements in business charters or amendments thereto – or to bylaws – are *highly* relevant and, as with some of its other contentions, M1 is unable to produce any case where a court thought they were or thought they were relevant at all.

More important – and far more relevant – is what the parties actually *do*: use, promotion, distribution or sales between the goods or services of the parties; what channels of commerce the parties employ, what consumers they actually target, and what their marketing procedures are. *See, e.g., Sorensen*, 792 F.3d at 730; *AutoZone,* 543 F.3d 923, 932 (7th Cir. 2008)(customer base and area of promotion); *Ty, Inc., v. Jones Grp., Inc*., 237 F.3d 891, 895 (7th Cir. 2001)("Several factors can be important when determining whether the area and manner of concurrent use as between two marks is likely to cause confusion, including: (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the products; (3) whether the products are sold to consumers in the same type of store; and (4) whether the product is sold through the same

9

marketing channels.").

In any event, for this category of documents, given the limited relevance of statements in charters and with due regard to the proportionality requirement under the Federal Rules of Civil Procedure, the assurance M1st has already given and the productions it has made will do.

**Category 5: Prior Litigation Materials**

**Merrick Bank/CardWorks Proceedings**

These proceedings concluded a dozen years ago. M1 notes that the public filings in the cases indicate they were voluntarily dismissed after settlement and complains that M1st has not produced the settlement agreement, the terms of which, of course, would be confidential. As it happens, M1st has belatedly produced the agreement from the CardWorks Proceedings. [Dkt. #99-1, at 12]. M1 does not indicate whether this piece of discovery turned out to be worthwhile or not, but argues that its production proves M1st was lying when it claimed it did not have a copy of the settlement agreement and complains that a recently produced email indicates it had previously been emailed by the law firm to M1st executives. [Dkt. #101, at 2]. But that email was from a dozen years ago, and went to an executive that let the company six years ago.[4]

And, M1 surely realizes that if M1st doesn't produce a piece of evidence, it can't rely on it to support an allegation down the road. Fed.R.Civ.p. 37(c)(1)("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

---

[4] This type of thing can happen when you are demanding thousands of pages of documents with many of those dating back a decade or two.

substantially justified or is harmless.").[5]

## Metro Bank Litigation

This litigation dates back to 2011, so that M1st did not possess extensive documentation from it is perhaps not astonishing. M1st did obtain the pleadings filed in the proceeding from the United States Trademark Trial and Appeal Board and produced those [Dkt. #74, at 6], and M1 says it "agrees that Members 1st has already produced a substantial amount of information relevant to the Metro Bank Litigation." [Dkt. #76, at 9]. And, consistent with the idea of rolling production, since the motion to compel has been fully briefed, M1st has produced its Responses to Requests for

---

[5] M1 also argued in its opening brief that because M1st adverted in its counterclaims to the Merrick Bank Litigation as an example of Members 1st "successfully" policing, protecting, and enforcing the M1st mark, this discovery is also "highly relevant" to these proceedings. [Dkt. #76, at 8]. A such, M1 wanted the agreement if it exists or seemingly wanted that assertion stricken from M1st's pleadings because it would be unsupported. [Dkt. #76, at 8]. Obviously, that seems a moot point now but, in any event, it was, or is, a matter for a substantive motion.

M1 does not expound on the import of this lone assertion regarding policing the M1st mark beyond its oft-repeated, conclusory and unhelpful assertion that the discovery at issue is "highly relevant." Past enforcement efforts can be relevant to an affirmative defense of acquiescence, *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 940 (7th Cir. 2016); *Bar's Prod. Inc. v. Bars Prod. Int'l Inc.*, 662 F. App'x 400, 413 (6th Cir. 2016), abandonment, *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 109 (2nd Cir. 2000), or as it's sometimes called, "naked licensing," *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 789 (7th Cir. 2011), but M1 does not contend that any of those are in play here in its brief. [Dkt. #71, at 76, at 7-8]. A review of the parties' filings in this case – complaint, answer, counterclaim, answer – shows that M1 advances an abandonment defense in its answer to M1st's counterclaim. [Dkt. #23, at 29-33].

Ideally, when asking for relief, a party should direct the court to docket entries and pages necessary to support its contentions, rather than leaving the court to sift through filings on its own. Courts do not act and should not be requested to act, in effect, as archaeologists and do the work counsel should have done. *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). *See also Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006)("An advocate's job is to make it easy for the court to rule in his client's favor . . . ."); *Jeffers v. Comm'r of Internal Revenue*, 992 F.3d 649, 653 (7th Cir. 2021); *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 510 (7th Cir. 2020).

Admissions, its Responses to Interrogatories, its Responses to Requests for Production, and Metro Bank's Responses to Interrogatories and Requests for Production. But, nevertheless, M1 wants more, specifically "discovery requests [like] interrogatories, requests for production, requests for admission, etc."

But there can't be much of that, if any, because, as the docket for the proceeding shows, the applicant withdrew the subject trademark application after M1st filed the notice of opposition. As M1st explains, there was no discovery because the proceeding consisted of just seven docket entries from four days in a span of six weeks. [Dkt. #74-3]. Still M1 insists that M1st is hiding something, although it can offer nothing to support the claim they are. That is not nearly enough to support their demands, especially given that tiny docket. *See Hubbard*, 247 F.R.D. at 29 (moving party must show "that documents that have been produced permit a reasonable deduction that other documents may exist or did exist."); *Gross v. Chapman*, 2020 WL 4336062, at *2 (N.D. Ill. 2020)("But, all that the plaintiffs provided here – in a motion barely 3 pages long – was mere speculation that there must be more texts about the breakup. Plaintiffs did not even cite a case in support of their motion to compel."); *Amarei v. City of Chicago*, 2016 WL 3693425, at *4 (N.D. Ill. 2016)(a court cannot compel plaintiff to produce what does not exist.);*Kendle v. Whig Enterprises, LLC*, No. 2:15-CV-1295, 2016 WL 898569, at *4 (S.D. Ohio Mar. 9, 2016)("However, plaintiff may not successfully move to compel discovery on the basis of a mere suspicion that the producing party possesses additional information that it has failed to disclose.").

**The 206 Design Litigation**

This case, at least, is from this decade. It was filed in February of 2022 and was dismissed by stipulation in March of 2023. [Dkt. #76-12]. Discovery was stayed throughout the brief

proceedings when M1st filed a motion to dismiss in lieu of an answer. Once that motion was fully briefed, the stipulated dismissal was entered. [Dkt. #76-12]. M1st produced copies of the pleadings and filings in its possession, initial disclosures, and deposition transcripts for two fact witnesses. [Dkt. #74, at 8]. So, M1st's position is that there wasn't much to produce. But that wasn't the case. Since the motion to compel has been fully briefed, M1st has produced over 500 pages of materials from the 206 Design Litigation, and it doesn't have much of an excuse, other than it didn't find them in its first go-round. [Dkt. #103, at 4-5]. M1st must complete production in this category and provide a sworn statement as to efforts by February 28, 2024.

**Fees**

Finally, there is the matter of fees. M1 wants fees and costs incurred in making the motion to compel. Given the submissions and the foregoing analysis of the parties' submissions, fees are not appropriate under Fed.R.Civ.P. 37(a)(5)(A)(ii), (iii). What probably needs to happen here is that the temperature of this case needs to cool a bit. While it is not quite at fever pitch, it is spiking a bit too high. One cannot get too angry about the pace of production when one agrees to production on a rolling basis and is still producing documents oneself. Moreover, not every piece of discovery is "highly relevant." Not every discovery dispute is a matter of such grave consequence that it must be conducted along the lines of Napoleon's retreat from Moscow. To use a well worn phrase, M1 has not begun scorching the earth in this case, but the tenor of its motion and supporting submissions leads one to believe it has the torches at hand and is willing to light them.

With that being said, M1st is ordered to complete production and produce a sworn statement that it has produced all responsive information, and address the specific points for the pertinent categories discussed above by February 28, 2024. For good measure, M1 is also ordered to complete

13

production by February 28, 2024, and to produce a sworn statement that it has produced all responsive information.

A final note. If there are other or unanswered issues, they can be discussed at the hearing on January 18, 2024.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/17/24